# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| CONTROLS SOUTHEAST, INC.,<br><br>Plaintiff,<br><br>v.<br><br>QMAX INDUSTRIES, INC. and<br>THOMAS W. PERRY,<br><br>Defendants. | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Controls Southeast, Inc. ("CSI") brings this Complaint breach of contract, unfair and deceptive trade practices, fraud, conspiracy, and violation of the Racketeer Influenced and Corrupt Organizations Act, against Defendants QMax Industries, Inc. ("QMax") and Thomas W. Perry ("Perry") (collectively, "Defendants"), and alleges as follows:

## NATURE OF CASE

1. Plaintiff and Defendants were parties to an earlier case in this Court, captioned *Controls Southeast, Inc. v. QMax Industries, Inc. et al.*, Case No. 3:16-cv-00230-FDW-DSC ("CSI I").

2. In CSI I, QMax and Perry, along with their other co-defendants, were accused by CSI of trade secret misappropriation, breach of contract, and unfair competition. CSI presented evidence showing that Defendants misappropriated CSI's trade secrets and confidential information, committed breach of contract, and unfairly competed with CSI. After over two years of litigation, CSI I was resolved by settlement.

1

3. The parties entered into a Settlement Agreement with an effective date of August 29, 2018. A true and correct copy of the Settlement Agreement is attached at Exhibit A.

4. QMax and Perry have breached the Settlement Agreement. Worse yet, QMax and Perry lied to CSI about their conduct, deceived CSI into believing that QMax and Perry were in compliance with the terms of the Settlement Agreement, and conspired with their distributors and representatives to commit fraud and unfair competition against CSI.

5. There is no justification for QMax's and Perry's unlawful conduct. CSI has suffered harm because of QMax's and Perry's unlawful acts. CSI respectfully petitions this Court for assistance in redressing the serious wrongs committed by QMax and Perry against CSI.

## PARTIES

6. CSI is a corporation organized and existing under the laws of the State of North Carolina, with a principal place of business at 12201 Nations Ford Road, Pineville, North Carolina 28134.

7. QMax is a corporation organized and existing under the laws of the State of North Carolina, with a place of business at 520-A Eagleton Downs Dr, Pineville, North Carolina 28134.

8. Perry is a resident of Pennsylvania and is believed to live at 254 Lynn Haven Drive, Pittsburgh, Pennsylvania 15228.

## JURISDICTION AND VENUE

9. As part of the Settlement Agreement, the parties agreed as follows (Ex. A, ¶ 12.8):

> In the event of any dispute over this Agreement, any action to resolve such dispute shall be governed by and construed in accordance with the laws of the State of North Carolina. In any legal proceeding arising out of or relating to this Agreement, the parties consent to the exclusive jurisdiction of the state courts located in

2

Mecklenburg County North Carolina and federal courts located in the Western District of North Carolina. Both parties expressly consent to and waive any objection to the personal jurisdiction and venue of these courts.

10. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

11. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because QMax and Perry are subject to personal jurisdiction in this judicial district.

12. QMax and Perry have submitted to the exclusive jurisdiction of this Court and waived any objections to personal jurisdiction and venue here.

**FACTS COMMON TO ALL COUNTS**

13. As a key term to settle CSI I, QMax and Perry agreed in the Settlement Agreement to refrain from selling products in the "Sulphur Field," directly or indirectly, for a period of three years from the effective date, or until August 29, 2021. (Ex. A, ¶ 4.1). This three-year period is defined as the "Exclusionary Period." (Ex. A, ¶ 4.1). "Sulphur Field" is defined to mean 'industrial processes such as sulphur recovery units and tail gas units, as well as any process which concerns the manufacture, transportation, or storage of any component which includes over twenty percent (20%) elemental sulfur or hydrogen sulfide." (Ex. A, ¶ 1.2).

14. QMax and Perry agreed in the Settlement Agreement that "[d]uring the Exclusionary Period, QMax shall condition the sale of its products to its distributors and representatives in writing on the basis that no products sold by QMax to its distributors and/or representatives may be subsequently sold to, transferred to or otherwise used in the Sulphur Field." (Ex. A, ¶ 4.1.2).

3

15. QMax and Perry were required to "provide an annual declaration, attesting that neither has directly or indirectly sold into the Sulphur Field." (Ex. A, ¶ 4.1.3).

16. QMax and Perry agreed that "[a]ny breach of this Section 4.0 by any Defendant shall be a material breach of this Agreement." (Ex. A, ¶ 4.2).

17. As part of the Settlement Agreement, QMax and Perry agreed to pay CSI a certain percentage of gross revenues for a period of years. (Ex. A, ¶ 5.1).

18. QMax and Perry agreed that "[a]ny breach of this Section 5.1-5.4 by any Defendant shall be a material breach of this Agreement." (Ex. A, ¶ 5.6).

19. CSI maintained the right to verify compliance with the terms of the Settlement Agreement. (Ex. A, ¶ 4.1.3, ¶ 5.4).

20. QMax and Perry represented, warranted, and covenanted that "they will not use other Persons to circumvent the obligations and restrictions set forth in Sections 4 and 5" of the Settlement Agreement. (Ex. A, ¶ 11.5).

21. The parties agreed to a limited exception for four identified contracts, as follows ((Ex. A, ¶ 4.1.1):

> Notwithstanding the restrictions set forth in Section 4.1, QMax may, during the Exclusionary Period, complete the backlog of 4 contracts (listed in Exhibit 2) that it has in place as of August 24, 2018. As a precondition to this limited exception, QMax shall first identify the parties and product quantities of these contracts to CSI.

22. Exhibit 2 of the Settlement Agreement listed "Excepted Contracts" as follows (Ex. A, ex. 2):

4

**Excepted Contracts**

| Date | Buyer | End User Location | Amount |
|------|-------|-------------------|--------|
| 6/13/18 | UO Group | Deer Park, TX | $100,000 |
| 8/21/18 | UO Group | Deer Park, TX | $100,000 |
| 8/16/18 | Virginia Heat Transfer | Hopewell, VA | $30,000 |
| 8/22/18 | Zirco | Calgary, AB | $75,000 |

23.     QMax and Perry listed false information in Exhibit 2 of the Settlement Agreement.

24.     QMax and Perry listed contracts in Exhibit 2 of the Settlement Agreement that did not exist as of August 29, 2018, the effective date of the Settlement Agreement.

25.     As of August 29, 2018, QMax did not have a contract with UO Group dated June 13, 2018 for $100,000.

26.     As of August 29, 2018, QMax did not have a contract with UO Group dated August 21, 2018 for $100,000.

27.     As of August 29, 2018, QMax did not have a contract with Virginia Heat Transfer dated August 16, 2018 for $30,000.

28.     As of August 29, 2018, QMax did not have a contract with Zirco dated August 22, 2018 for $75,000.

29.     On information and belief, QMax and Perry listed these contracts in the Settlement Agreement as placeholders and without any sales orders in the amounts listed, in the hopes that actual contracts and sales orders would be entered thereafter.

30.     QMax and Perry did not inform CSI that no contracts or sales orders existed for the "Excepted Contracts" listed in the Settlement Agreement.  In fact, QMax and Perry led CSI to believe that contracts had been entered, given the representation in the Settlement Agreement that QMax had a "backlog" of four "contracts" that it "has in place" as of August 24, 2018.

5

31. The statements and representations in the Settlement Agreement about QMax's "Excepted Contracts" were materially false.

32. The restrictions on Defendants set forth in Section 4.0 of the Settlement Agreement were a material term of settlement.

33. Defendants voluntarily entered into the Settlement Agreement, after receiving advice of their own counsel, and with full knowledge of and consent to the terms to which they agreed.

34. Pursuant to Section 4.1.1 of the Settlement Agreement, QMax did not first identify the "parties and product quantities" of any contracts to CSI.

35. Pursuant to Section 4.1.1 of the Settlement Agreement, QMax has never first identified the "parties and product quantities" of any contracts to CSI.

36. QMax and Perry did not satisfy, and have never satisfied, the precondition to the limited exception in Section 4 of the Settlement Agreement.

37. Perry submitted a declaration signed on November 18, 2019, swearing under penalty of perjury that "I and QMax have complied with all of the requirements of Section 4.0 of the Settlement Agreement . . . Neither I nor QMax has directly or indirectly sold into the Sulfur Field since the execution of the Settlement Agreement (with the exception of the projects listed on the agreement)." A true and correct copy of this declaration is attached at Exhibit B.

38. Perry submitted a declaration signed on May 26, 2020, swearing under penalty of perjury that "Neither I nor QMax has quoted, marketed and/or sold products into the Sulfur Field (as that term is defined in Section 1.2 of the Agreement), either directly or indirectly since the execution of the Settlement Agreement (with the exception of the contracts listed in Exhibit 2 to the Agreement)." A true and correct copy of this declaration is attached at Exhibit C.

39. Perry submitted a declaration signed on November 16, 2020, swearing under penalty of perjury that "I and QMax have complied with all of the requirements of Section 4.0 of the Settlement Agreement . . . Neither I nor QMax has directly or indirectly sold into the Sulfur Field since the execution of the Settlement Agreement (with the exception of the projects listed on the agreement)." A true and correct copy of this declaration is attached at Exhibit D.

40. The November 18, 2019 declaration contained one or more false statements.

41. The May 26, 2020 declaration contained one or more false statements.

42. The November 16, 2020 declaration contained one or more false statements.

43. Perry represented to CSI that he sent a letter to all of QMax's representatives dated September 12, 2018, notifying them of their restrictions of selling into the Sulphur Field.

44. Perry represented to CSI that he sent a press release to all of QMax's customers dated September 17, 2018, notifying them of their restrictions of selling into the Sulphur Field.

45. QMax's representatives include Texas Steam, UO Group, LA Steam and/or Mr. Jay D'Amico.

46. After the parties entered into the Settlement Agreement, and based on representations and sworn statements provided by Perry, CSI believed that QMax and Perry were complying with their settlement obligations. Unbeknownst to CSI, QMax and Perry were engaged in a massive fraud to deceive, and unfairly compete with, CSI.

47. During the Exclusionary Period, and despite the restrictions contained in the Settlement Agreement, QMax and Perry were working with Texas Steam, UO Group and/or Mr. Jay D'Amico on a new tracing project at the Shell refinery in Deer Park, Texas.

48. A project at the Shell refinery in Deer Park, Texas on Sulfur Tank (T-93401) was installed/completed after August 29, 2018 with tracing from QMax.

7

49. An order was placed after August 29, 2018 for tracing from QMax for a sulfur transfer line project at the Shell refinery in Deer Park, Texas.

50. On information and belief, a scope of work document was issued on or about January 22, 2020, for tracing for a sulfur transfer line project at the Shell refinery in Deer Park, Texas.

51. On information and belief, a purchase order was issued on or about February 19, 2020, for tracing for a sulfur transfer line project at the Shell refinery in Deer Park, Texas.

52. On information and belief, QMax has supplied or is in the process of supplying the Shell refinery in Deer Park, Texas with tracing in the "tube over channel" geometry introduced by QMax after the effective date of the Settlement Agreement.

53. QMax's supply of products with the "tube over channel" geometry to the Shell Refinery in Deer Park, Texas after the effective date of the Settlement Agreement was not part of the backlog of contracts listed in Exhibit 2 of the Settlement Agreement.

54. The sales of QMax products for the Shell refinery in Deer Park, Texas were in the Sulphur Field during the Exclusionary Period, as defined in the Settlement Agreement.

55. QMax and Perry, and its distributors and representatives, were prohibited from selling products to the Shell refinery in Deer Park, Texas for a sulfur transfer line and/or sulfur tank, including Sulfur Tank T-93401, from August 29, 2018 until August 29, 2021.

56. During the Exclusionary Period, and despite the restrictions contained in the Settlement Agreement, QMax and Perry were working with LA Steam on a new tracing project at the Calumet facility in Shreveport, Louisiana.

57. In or around April/May 2021, LA Steam offered to sell and/or sold tracing from QMax for use in a sulfur application.

8

58. On information and belief, QMax and Perry were aware of and involved in the offer for sale and/or sale of products by LA Steam to the Calumet facility in Shreveport, Louisiana in or around April/May 2021.

59. The Calumet facility in Shreveport, Louisiana was not part of the backlog of contracts listed in Exhibit 2 of the Settlement Agreement.

60. The sales and/or offers for sale of QMax products for the Calumet facility in Shreveport, Louisiana were in the Sulphur Field during the Exclusionary Period, as defined in the Settlement Agreement.

61. QMax and Perry, and its distributors and representatives, were prohibited from selling products to the Calumet facility in Shreveport, Louisiana for use in the Sulphur Field, from August 29, 2018 until August 29, 2021.

62. After entering into the Settlement Agreement, and with full knowledge of its terms and restrictions, QMax and Perry intentionally violated the terms thereof. Indeed, on information and belief, QMax and Perry never had any intention of complying with their obligations under the Settlement Agreement.

63. In a letter dated May 19, 2020, CSI, through counsel at Ametek, informed Perry that CSI believed that QMax and Perry were in violation of their obligations under the Settlement Agreement. A true and correct copy of this letter is attached at Exhibit E.

64. Perry responded to CSI in a letter dated May 27, 2020. A true and correct copy of this letter with attachments is attached at Exhibit F. In this letter, Perry stated as follows:

9

The letter you sent dated May 19, 2020 comes to a surprise to QMax. I can assure you that QMax and its employees take this agreement seriously and work to honor the agreement. Since the agreement was signed on or about August 29, 2018, QMax has taken several steps to ensure we do not directly or indirectly sell any of our systems into the Sulphur field as outlined by the agreement.

1) As shown in the attachments, a letter was sent to all of our representatives, including Texas Steam, and a Press Release to all of our customers, including Texas Steam notifying them of our restriction of selling into the Sulphur Field.

2) As shown in the attachments, a condition of our sale is the acknowledgement of not selling into the Sulphur Field. These terms are listed on all proposals and estimates.

3) Every November through 2021 a Declaration that I, Tom Perry, have signed and notarized stating our compliance with this agreement is sent to Ametek. A further Declaration as sent by Ametek is also attached.

4) We keep records of all sales, even those refused during this restriction, and have zero records showing any of our products being sold into the Sulphur Field since the date the agreement went into effect.

65. CSI, through outside legal counsel, sent Perry another letter dated December 16, 2020, regarding QMax's and Perry's breach of the Settlement Agreement. A true and correct copy of this letter is attached at Exhibit G.

66. Perry responded to CSI in an email dated January 7, 2021. A true and correct copy of this email is attached at Exhibit H. In this email, Perry stated as follows:

I've further investigated this alleged sale of QMax products into the sulfur industry by the companies owned by Jay D'Amico by speaking with Mr. D'Amico and reviewing our sales records. We have concluded after this investigation that all sales we made to Mr. D'Amico's companies complied with the requirements of the settlement agreement. While the detail you have provided to date is not sufficient for anyone to identify the date and location of the installation you have challenged, our investigation has revealed that any installation of QMax's newer product in a sulfur application would have been the result of a customer-facilitated change order within the terms of the contracts identified in Exhibit 2 in the Settlement Agreement. QMax has not knowingly made sales for sulfur applications outside those expressly excepted contracts.

67. The limited exception in the Settlement Agreement did not include "customer-facilitated change order[s]."

68. "QMax's newer product" has been installed "in a sulfur application" during the Exclusionary Period set forth in the Settlement Agreement.

10

69. Perry's email dated January 7, 2021, shows that Perry and Mr. Jay D'Amico were working together after August 29, 2018, including in their sales of QMax products and in their communications with CSI.

70. Defendants, either on their own or through their distributors and representatives, concocted a scheme to falsely claim prohibited sales were "change orders" in order to try to circumvent the terms of the Settlement Agreement.

71. Defendants falsely claimed contracts that did not exist and/or artificially stated contract values in order to falsely claim that prohibited sales were part of Excepted Contracts under the Settlement Agreement.

72. Defendants' actions show that they had no intentions of abiding by the terms of the Settlement Agreement since before it was even executed.

73. Defendants, either on their own or through their distributors and representatives, sold products in the Sulphur Field during the Exclusionary Period.

74. Defendants knew or had reason to know that products they sold during the Exclusionary Period were for the Sulphur Field.

75. Defendants, in conjunction with their distributors and representatives, knew or had reason to know that products sold for installation at the Shell refinery in Deer Park, Texas were in the Sulphur Field during the Exclusionary Period.

76. Defendants, in conjunction with their distributors and representatives, knew or had reason to know that products sold for installation at the Calumet facility in Shreveport, Louisiana were in the Sulphur Field during the Exclusionary Period.

77.     Defendants, in conjunction with their distributors and representatives, conspired to use, and in fact have used, "change orders" to circumvent the restrictions in the Settlement Agreement.

78.     Defendants, in conjunction with their distributors and representatives, made false representations to CSI, and intentionally misled CSI, through communications sent via mail and/or wire, about the facts concerning Defendants' sales of products during the Exclusionary Period.

79.     CSI relied on Defendants' representations, several of which were made under oath in sworn declarations, that Defendants and their distributors and representatives had not sold products into the Sulphur Field during the Exclusionary Period.

80.     On at least four occasions between August 29, 2018 and January 7, 2021, Defendants made false and misleading statements intending to deceive CSI into believing that Defendants and their distributors and representatives had not sold products that they were prohibited from selling.

81.     The Settlement Agreement contains an audit provision (Ex. A, ¶ 7.0), which includes the following:

> 7.3     Upon reasonable request by CSI, Defendants shall provide access to the Accounting System to a third party auditor selected by CSI. The Accounting System, and all supporting or underlying documents and materials shall be made available to the auditor during normal business hours. All information disclosed in connection with this section shall be used only for purposes of verifying compliance with this Agreement and, absent a difference in the amount reported by Defendants and the amount determined by the auditor or other discrepancy, no information obtained during any audit shall be disclosed to CSI.
>
> 7.4     The cost of any audits conducted under Section 7.0 shall be borne by CSI, unless the audit identifies either that Defendants: 1) have underpaid CSI by more than one-half of one percent (.5%); or 2) sold any goods into the Sulphur Field during the Exclusionary Period. In either instance, Defendants shall reimburse CSI for the total costs of the audit.

82. CSI invoked the audit provision in the Settlement Agreement and requested documents from Defendants through a third party auditor at Dixon Hughes Goodman LLP.

83. Defendants refused to make available all supporting and underlying documents and materials to verify compliance with the Settlement Agreement.

84. Defendants have breached their contractual obligations, lied under oath to CSI, conspired with their distributors and representatives to harm CSI, and acted with malicious intent to unfairly and deceptively compete with CSI.

## COUNT I
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

85. The allegations in the preceding paragraphs are incorporated herein by reference.

86. Defendants are associated in fact with themselves and their distributors and representatives.

87. Defendants, including their distributors and representatives, are an enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with the enterprise.

88. Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.

89. Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of fraud against Plaintiff through false and misleading statements to Plaintiff, sent via mail/wire, including the November 18, 2019, May 26, 2020, and November 16, 2020 declarations, with the intention of concealing the enterprises unlawful conduct.

90.     Defendants communicated with their distributors and representatives, and others, over mail/wire, including the September 12, 2018 memorandum and September 17, 2018 press release, in furtherance of their fraudulent conduct.

91.     Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise, including by profiting from sales of prohibited products in contravention of Plaintiff's rights.

92.     Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity.  Without the multiple related acts that comprise the pattern, Defendants would not have the same business, sales, market share, income, profits, customers, distributors, and representatives that they enjoy as a result of the racketeering activity. Defendants acted in their own self-interests and with knowledge that their conduct would result in harm to Plaintiff.

93.     The predicate acts of racketeering activity engaged in by Defendants and those acting in concert with them or under their direction, include but are not limited to participation in a scheme to defraud by use of interstate mail/wire (18 U.S.C. § 1343), as alleged herein.

94.     Defendants agreed and conspired to violate 18 U.S.C. § 1962 through their pattern of racketeering activities.  Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

95.     The acts set forth herein constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961.

96.     Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962.

97.     As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962, Plaintiff's business has been injured.

98.     Plaintiff's business was injured by reason of these violations in that as a direct and proximate result of Defendants' acts, Plaintiff suffered damages, as alleged herein.

99.     By reason of the Defendants' violations as specified above, Plaintiff is entitled to three times actual damages pursuant to 18 U.S.C. § 1964, with interest thereon from the date of loss and reasonable attorneys' fees.

## COUNT II
### FRAUD

100.    The allegations in the preceding paragraphs are incorporated herein by reference.

101.    Defendants intentionally included false material facts as part of the Settlement Agreement, specifically concerning Excepted Contracts listed in the Settlement Agreement.

102.    Since the entry of the Settlement Agreement, Defendants have committed fraud by intentionally and falsely representing that they were in compliance with the Settlement Agreement terms and conditions.

103.    In furtherance of their fraud, Defendants submitted one or more false declarations to Plaintiff and several additional correspondence, as described above, that were blatantly false and misleading.

104.    Plaintiff relied on Defendants false representations, to its detriment.

105. Defendants' false representations were material to (1) Plaintiff entering into the Settlement Agreement, and (2) Plaintiff continuing under the Settlement Agreement while Defendants were not in compliance.

106. Defendants, and each of them, conspired to commit fraud as alleged herein, in that Defendants, with their distributors and representatives, conspired to deceive Plaintiff concerning sales of products into the Sulphur Field during the Exclusionary Period.

107. Defendants have continued their fraud through the audit process, in which they concealed and lied about contracts and sales that were prohibited by the Settlement Agreement.

108. Defendants fraudulent conduct was committed in furtherance of their own interests, and was intentional, willful, malicious, wanton, and oppressive, and done with conscious and callous disregard for the consequences, and with the specific intent to harm Plaintiff.

109. Plaintiff has suffered harm as a result of Defendants' fraudulent conduct.

110. Plaintiff is entitled to an award of punitive damages from Defendants and each of them in an amount to be proven at trial, sufficient to punish, penalize and deter Defendants from engaging in such conduct in the future.

## COUNT III
### CIVIL CONSPIRACY / FACILITATION OF FRAUD

111. The allegations in the preceding paragraphs are incorporated herein by reference.

112. Defendants conspired with each other and/or with their distributors and representatives to fraudulently and deceptively (1) convince Plaintiff to enter the Settlement Agreement, and (2) sell products in unlawful competition with Plaintiff.

113. In furtherance of the conspiracy, Defendants made false representations in the Settlement Agreement concerning its alleged contracts with certain third parties.

16

114.     Also in furtherance of the conspiracy, Defendants made false representations in communications with Plaintiff, including in the declarations dated November 18, 2019, May 26, 2020, and November 16, 2020, and correspondence about the Settlement Agreement terms and conditions.

115.     Defendants, and their distributors and representatives, capitalized on their fraud by obtaining dismissal of Plaintiff's claims made against them in CSI I, and by selling products, and thus profiting from sales of products, that they were prohibited from selling.

116.     Plaintiff has suffered harm as a result of Defendants' fraudulent conduct.

### COUNT IV
### BREACH OF CONTRACT

117.     The allegations in the preceding paragraphs are incorporated herein by reference.

118.     The Settlement Agreement is a valid and enforceable contract.

119.     Defendants breached their contractual obligations under the Settlement Agreement.

120.     Defendants breached Sections 4, 5 and 7 of the Settlement Agreement.

121.     Plaintiff has been harmed by Defendants' conduct, as alleged herein, and is entitled to relief, as requested herein.

122.     Plaintiff is entitled to recover from Defendants, and each of them, such compensatory and/or punitive damages as will be proven at trial.

123.     In addition to the above, Plaintiff is entitled to recover the total costs of the audit pursuant to Section 7.4 of the Settlement Agreement.

17

## COUNT V
### UNFAIR AND DECEPTIVE TRADE PRACTICES

124.    The allegations in the preceding paragraphs are incorporated herein by reference.

125.    Defendants' acts as alleged herein have been willful, reckless, wanton, egregious, unfair, unethical, deceptive, and unscrupulous.

126.    Defendants' conduct, which is in or affecting commerce, constitutes unfair methods of competition and/or unfair and deceptive acts or practices, within the meaning of North Carolina General Statutes § 75-1.1 and North Carolina common law.

127.    Plaintiff has been damaged by Defendants' conduct and is entitled to monetary and injunctive relief pursuant to North Carolina General Statutes § 75 et seq. and other applicable law, such relief includes an award of monetary damages, including the amount of the actual losses caused to Plaintiff by Defendants' unfair competition, lost profits, disgorgement of the unfair gains and other unjust enrichment benefiting Defendants, attorneys' fees and costs pursuant to North Carolina General Statutes § 75-16.1, and treble damages pursuant to N.C. Gen. Stat. § 75-16, together with any and all amounts to be shown at trial.

## PRAYER FOR RELIEF

In view of the foregoing, CSI asks that this Court grant the following relief:

A.    Find that Defendants violated the Racketeer Influenced and Corrupt Organizations Act;

B.    Find that Defendants breached the Settlement Agreement;

C.    Find that Defendants committed fraud and conspired to facilitate fraud, against Plaintiff;

D.    Find that Defendants have committed unfair and deceptive acts in violation of North Carolina statutory law;

18

E.  Order an accounting and render judgment against Defendants for all profits wrongfully derived by Defendants by their unfair and deceptive acts;

F.  Order an accounting and render judgment against Defendants for all profits wrongfully derived by Defendants;

G.  Order Defendants to disgorge to CSI all wrongfully derived profits;

H.  Award all damages adequate to compensate CSI for Defendants' unlawful acts;

I.  Award Plaintiff the total costs of the audit;

J.  Award CSI punitive damages;

K.  Award CSI treble damages pursuant to N.C. Gen. Stat. § 75-16.

L.  Award CSI its costs and reasonable attorneys' fees to the extent permitted by law;

M.  Award CSI prejudgment and post-judgment interest on all amounts awarded; and

N.  Award CSI such other and further relief as the Court deems just and proper.

Plaintiff hereby demands a trial by jury of all issues in this action so triable.

Respectfully submitted,

Dated: June 24, 2021

*s/ J. Mark Wilson*
J. Mark Wilson
N.C. State Bar No. 25763
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Telephone (704) 331-1000
Facsimile (704) 339-5981
Email: markwilson@mvalaw.com

19