# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:21-cv-00302-MOC-DSC

| | |
|---|---|
| **CONTROLS SOUTHEAST, INC.,** | |
| **Plaintiff,** | |
| **v.** | **DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PURSUANT TO RULES 12(B)(1) AND 12(B)(6)** |
| **QMAX INDUSTRIES, INC. and THOMAS W. PERRY,** | |
| **Defendants.** | |

This is a lawsuit between non-diverse parties alleging the breach of a settlement agreement, asserting claims for breach of contract, fraud, civil conspiracy and unfair and deceptive trade practices. As the basis for its placement in federal court, Plaintiff Controls Southeast, Inc. ("CSI") alleges that the breach of the settlement agreement amounts to racketeering in violation of federal law. Yet our courts have repeatedly cautioned against using the Racketeer Influenced and Corrupt Organizations Act ("RICO") as a basis to preempt state-law disputes. CSI's effort to do so here is transparent. Because CSI has identified no predicate acts, because an expired three-year settlement agreement cannot give rise to sufficient continuity, and because there is only one alleged victim of this supposed scheme, there can be no claim under RICO. In the absence of a claim under RICO, this Court lacks subject matter jurisdiction over this quintessentially state-law dispute. Defendants request that this Court dismiss this matter in its entirety.

# I. FACTUAL ALLEGATIONS

Plaintiff CSI is a North Carolina corporation operating its principal place of business in Pineville, North Carolina. (Compl. ¶ 6.) Defendant QMax Industries, Inc. ("QMax") is likewise a North Carolina corporation operating from North Carolina. (*Id.* ¶ 7.) Defendant Thomas W. Perry, a principal of QMax, is now a resident of Pennsylvania. (*Id.* ¶ 8.)

In 2016, CSI sued QMax on a number of grounds. (*Id.* ¶¶ 1-2.) One of the grounds omitted from CSI's recitation, but that was the source of federal jurisdiction in that case, was CSI's claims for declaratory relief concerning several federal patents. *See* 3:16-cv-00230-FDW-DSC *Dkt.* 1 ¶ 1. The parties resolved the 2016 litigation by a settlement agreement on August 29, 2018. (Compl. ¶ 3 & Ex. A, the "Settlement Agreement".)

The Settlement Agreement contained a provision in which QMax and Perry agreed that they would not sell products into the "Sulphur Field," as defined by the Settlement Agreement, for three years. (Compl. ¶ 13.) QMax and Perry also agreed to provide an annual attestation to CSI of their compliance with this provision. (*Id.* ¶ 15.)

The Settlement Agreement's no-sulphur-sales-provision contained an express exception for four contracts in place before the parties executed the agreement. (*Id.* ¶ 21.) CSI claims that the information about the four contracts, listed in the Settlement Agreement by date, buyer, location and amount, was false. (*Id.* ¶¶ 23-31.) The Complaint alleges that therefore Perry's three successive declarations regarding QMax's lack of sales in the Sulphur industry from November 2019 to November 2020 were false. (*Id.* ¶¶ 37-42.)

CSI contends that QMax and Perry violated the no-sulphur-sales-provision in two other ways. First, CSI alleges that QMax supplied an unspecified amount of product in response to a scope of work document issued on January 22, 2020 for a project at a Shell refinery in Deer

Park, Texas.  (*Id.* ¶¶ 47-55.)  CSI finally contends that QMax and Perry, "[o]n information and belief," working through a distributor, sold an unspecified amount of product for a sulphur application in April or May 2021.  (*Id.* ¶¶ 56-60.)  CSI claims that, after it confronted QMax and Perry about these two projects, Perry made false claims about the source of the products and secretly concealed his and QMax's years-long intentions to breach the Settlement Agreement. (*Id.* ¶¶ 70-76.)

In the most conclusory of terms, CSI claims that it "relied on Defendants' representations" that they "had not sold products into the Sulphur Field during the Exclusionary Period."  (*Id.* ¶ 79.)  The Complaint provides no factual detail whatsoever regarding what actions CSI took, or could have taken, in reliance on these representations—after all, CSI has filed a lawsuit claiming that it does not believe QMax and Perry's representations to be true.

Indeed, the Complaint instead admits, just a few paragraphs later, that CSI did not rely on QMax and Perry's representations.  Instead, CSI invoked its rights under the audit provisions of the Settlement Agreement and hired a third-party auditor to audit QMax's books and records. (*Id.* ¶¶ 81-82.)  Dissatisfied with the results of the audit, which in no way corroborate the allegations of this lawsuit, CSI filed the instant lawsuit in federal court.

## II. ARGUMENT

### A.  *RICO is Not a Tool to Convert Federal Courts into Forums for State-Law Claims.*

Congress's primary intent in passing RICO was to use it to combat the proliferation of organized crime, especially the "predations of mobsters."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 245, 109 S.Ct. 2893, 2904 (1989); s*ee Russello v. U.S.*, 464 U.S. 16, 25, 104 S.Ct. 296, 302 (1983) (stating that RICO was passed with the intent to use it "in a broad assault on organized crime."); *U.S. v. Turkette*, 452 U.S. 576, 591, 101 S.Ct. 2524, 2532 (1981) ("[T]he legislative history [of RICO] forcefully supports the view that the major purpose of [RICO] is to address the

infiltration of legitimate business by organized crime.").  When faced with a RICO claim, courts must "ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions are not eclipsed or preempted."  *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quoting *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 683 (4th Cir. 1989)).

Courts within the Fourth Circuit have a long history of dismissing civil RICO claims where the conduct described is not subject to regulation by RICO.  *Menasco, Inc*, 886 F.2d at 685 (dismissing the plaintiff's RICO claim because "if we were to recognize a RICO claim based on the narrow fraud alleged here, the pattern requirement would be rendered meaningless."); *GE Inv. Private Placement Partners v. Parker*, 247 F.3d 543 (4th Cir. 2001) (dismissing the plaintiff's RICO claim for failure to allege conduct that posed a special threat to social-well-being.); *Sealy v. U.S. Bank Nat'l Assoc.*, No. 3:20-CV-431, 2021 WL 1178063 at *3 (W.D.N.C. Mar. 29, 2021) (dismissing the plaintiff's RICO claim because "these particular wire fraud counts would collectively constitute one interaction with the Plaintiffs rather than . . . a larger pattern.").  This is not a matter of formalistic pleading standards but instead a straightforward review of whether the exercise of federal jurisdiction is appropriate over claims that derive from matters regulated principally by state law.  *See, e.g.*, *US Airline Pilots Ass'n*, 615 F.3d 312 (affirming dismissal of RICO claim for failure to state a claim and lack of subject-matter jurisdiction).  Here, the defect of CSI's Complaint is not that it has stated a merely implausible claim for violation of RICO, but that it has affirmatively described facts establishing, on multiple grounds, that no RICO claim can exist.

### B. CSI's Complaint Identifies No Predicate Act That Could Serve as the Basis of a RICO Claim.

A RICO claim can arise only from allegations that the defendants engaged in, or conspired to engage in, a pattern of racketeering activity. 18 U.S.C. § 1962; *US Airline Pilots Ass'n*, 615 F.3d at 317. The statute defines "racketeering activity" to include a number of predicate acts—relevant here are only mail and wire fraud. 18 U.S.C. § 1961(1)(B). When a RICO plaintiff fails to allege the elements of at least two predicate acts, the claim must be dismissed. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 235 (4th Cir. 2004) (dismissing a RICO claim because the plaintiff failed to properly allege the elements of mail or wire fraud). Here, CSI's claim fails to identify a justiciable federal claim under RICO because it does not actually allege, nor could it allege, predicate acts of mail and wire fraud.

At least three different reasons compel the conclusion that CSI's claims here are, at most, prototypical state law claims for breach of contract and fraud rather than claims asserting criminal mail or wire fraud. First, the Fourth Circuit has expressly counseled that courts should be cautious when faced with RICO claims based on supposed wire and mail fraud because such claims often constitute garden-variety commercial fraud that is best prosecuted under state law. Second, no mail or wire fraud could have occurred here because the alleged "fraud" did not deprive CSI or anyone else of anything of value. Finally, CSI's conclusory assertions of detrimental reliance cannot support any kind of fraud claim.

At the outset, courts should be "cautious" about basing a RICO claim on predicate acts of mail and wire fraud because "it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (quoting *Anderson v. Found. for Advancement, Educ. and Emp't of Am. Indians,* 155 F.3d 500, 506 (4th Cir.1998)). "This caution is designed to preserve a distinction between

ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Id.* (citing *Anderson,* 155 F.3d at 506).

This Court ought to be especially wary of converting these garden-variety state law claims into a RICO claim where, as here, the complaint does not even allege that mail or wire fraud actually took place. The commission of criminal mail or wire fraud requires that the defendant (1) devised or intended to devise a scheme to defraud and (2) used mail or wire communications in furtherance of the scheme. *U.S. v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012) (citing *U.S. v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012)).

Here, CSI's allegations attempting to translate QMax and Perry's supposed fraudulent acts into mail or wire fraud are woefully insufficient:

> 89.    Pursuant to and in furtherance of their fraudulent scheme, Defendants committed multiple related acts of fraud against Plaintiff through false and misleading statements to Plaintiff, sent via mail/wire, including the November 18, 2019, May 26, 2020, and November 16, 2020 declarations, with the intention of concealing the enterprises unlawful conduct.
>
> 90.    Defendants communicated with their distributors and representatives, and others, over mail/wire, including the September 12, 2018 memorandum and September 17, 2018 press release, in furtherance of their fraudulent conduct.

(Compl. ¶¶ 89-90.)

These allegations do not identify any form of fraud at all, let alone federal mail or wire fraud. First and foremost, the September 12, 2018 and September 17, 2018 communications could not be "in furtherance of" a fraudulent scheme because, as the Complaint alleges, those communications were sent with the purpose of "notifying [Qmax's customers] of [Qmax]'s restrictions of selling into the Sulphur Field." (Compl. ¶¶ 43-44.) These communications would not further a fraudulent scheme to violate the no-sulphur-sales-provision but would have instead had the exact opposite effect.

Thus, at its most charitable construction CSI has alleged three misleading acts, spanning one year, from November 18, 2019 to November 16, 2020—sending three declarations of compliance with the Settlement Agreement, for which QMax and Perry received nothing in return. CSI's Complaint does not provide any detail whatsoever about how these statements actually furthered a scheme to defraud anyone of anything. (Compl ¶¶ 89-90.) Because CSI has not alleged how any supposedly misleading statement furthered a scheme where that scheme had allegedly already been carried out, its RICO claim lacks any single predicate act.

Even if there had been some false communication in furtherance of a scheme, there could be no mail and wire fraud still because no one, CSI included, was deprived of any money or property. As used in the mail and wire fraud statue, the element "to defraud" has "the common understanding of *wronging one in his property rights* by dishonest methods or schemes and usually signif[ies] the deprivation of something of value by trick, deceit, chicane, or overreaching." *Wynn*, 684 F.3d at 477-78 (quoting *Carpenter v. U.S.*, 484 U.S. 19, 27, 108 S.Ct. 316, 321 (1987)) (emphasis added). Thus, for there to be mail or wire fraud, it is essential that the victim actually had an interest in money or property obtained by the defendant. *U.S. v. Gillion*, 704 F.3d 284, 295 (4th Cir. 2012). Here, there is not a single allegation—nor could there be—that QMax or Perry obtained anything from CSI by tendering their periodic affirmations of compliance with the Settlement Agreement. In fact those affirmations were ultimately fruitless—CSI audited and then sued QMax and Perry notwithstanding their affirmations. (Compl. ¶ 82.)

Finally, CSI has failed to state a RICO claim because its allegations of reliance, proximate cause, and injury are unsupported and conclusory. A plaintiff alleging a RICO violation based on mail or wire fraud must allege that it detrimentally relied on the fraudulent

communications and that the communications were a proximate cause of an injury. *Am.*
*Chiropractic Ass'n*, 367 F.3d at 233; *Chisold v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir.
1996). Claims for fraud must be pled subject to Federal Rule of Civil Procedure 9(b), which
requires that the claimant plead fraud with specificity. *Harrison v. Westinghouse Savannah*
*River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). A RICO claim that asserts mere "conclusory
allegations" fails to satisfy the particularity requirement under Rule 9(b) and must be dismissed.
*Menasco, Inc.,* 886 F.2d at 684.

Here, CSI asserts mere conclusory allegations about reliance, proximate cause, and
injury. CSI's allegations related to reliance are limited to the following:

> 78. CSI relied on Defendants' representations, several of which were made under oath in sworn declarations, that Defendants and their distributors and representatives had not sold products in to the Sulphur Field during the Exclusionary Period.

(Compl. ¶ 78.) At no point does CSI describe what actions it took in reliance on the
communications or when it took such actions. Rather than relying on these communications,
CSI invoked its audit rights. (Compl. ¶ 82.)

Further, CSI's allegations related to proximate cause and injury are limited to the
following:

> 97. As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962, Plaintiff's business has been injured.
>
> 98. Plaintiff's business was injured by reason of these violations in that as a direct and proximate result of Defendants' acts, Plaintiff suffered damages, as alleged herein.

(Compl. ¶ 97-98.) Nowhere in the complaint does CSI describe precisely what injury it suffered
as a result of the fraudulent communications nor how the communications caused or were related
to such injury. Because CSI has provided only conclusory allegations relating to its reliance on

the purported fraudulent statements, the injury caused by such statements, and how the statements were the proximate cause of any injury, CSI's RICO claim must be dismissed.

Ultimately, CSI's Complaint boils down to the assertion that QMax and Perry lied to it about their compliance with the Settlement Agreement. There is serious doubt about whether this even states a claim for fraud under state law. But it most certainly does not constitute any form of mail or wire fraud that could serve as a predicate act for a RICO claim.

### C. *A RICO Claim Requires Continuity of Misconduct; A Now Expired Three-Year Settlement Agreement Can Provide No Such Opportunity for Continuity.*

A RICO claim requires not merely predicate acts, but their "continuity plus relationship," meaning that the predicate acts are related and that they amount to or pose a threat of continued criminal activity. *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900. A plaintiff must allege a "pattern of racketeering activity" to state a claim under RICO. *Id.* at 237, 109 S.Ct. at 2899. The purpose of the pattern requirement is to prevent ordinary, state law commercial fraud cases from being transformed into federal RICO claims. *See Menasco, Inc.*, 886 F.2d at 685 ("If the pattern requirement has any force whatsoever, it is to prevent this type of ordinary commercial fraud from being transformed into a federal RICO claim"); *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) ("[T]his circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims."). The continuity element arises from Congress' concern with long-term criminal conduct, and as such, it demonstrates Congress' desire to limit RICO's application to "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Menasco,* 886 F.2d at 684 (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir.1987)). CSI Complaint reveals the impossibility of such a pattern.

There are two types of continuity in RICO cases—open-ended and closed-ended.  *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902.  CSI cannot demonstrate either type.  A plaintiff cannot demonstrate open-ended continuity if the racketeering activity has a built-in ending point because there is no threat that the racketeering activity will extend into the future.  *Parker,* 247 F.3d at 549; *US Airline Pilots Ass'n,* 615 F.3d at 318.

In *Parker*, the defendants engaged in a series of mail and wire frauds to inflate artificially the value of their company before its initial public offering.  *Parker*, 247 F.3d at 546.  The plaintiffs, who were investors in the company, alleged that these acts of mail and wire fraud served as predicate acts to a RICO violation.  *Id.* at 548.  Affirming dismissal, the Fourth Circuit held that the scheme did not have sufficient continuity.  *Id.* at 549.  The court reasoned that the seventeen-month period of fraudulent conduct was insufficient to allege closed-ended continuity and that open-ended continuity was not present because the initial public offering served as a built-in ending point to the fraudulent conduct.  *Id.*

The same is true here.  The scheme alleged by CSI has a built-in ending point that has already passed—the end to the exclusionary period on August 29, 2921.  (Compl. ¶ 13.)  Because there is no threat that the alleged fraudulent conduct can continue into the future, there is no open-ended continuity.

Nor could this dispute over settlement-agreement compliance implicate closed-ended continuity.  When the alleged criminal activity at issue has ended, the requisite continuity exists only when the activity had extended over a substantial period.  *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902; *Walk v. Baltimore and Ohio R.R.*, 890 F.2d 688, 689-90 (4th Cir. 1989).

The inquiry into closed-ended continuity addresses Congress' expressed intent of providing a remedy for long-term criminal conduct.  *Walk*, 890 F.2d at 689-90.  Cases involving

racketeering activities over the course six or more years present close questions of closed-ended continuity. *See id.* at 690 (finding that a case involving "many" racketeering activities over the course of ten years was a close call); *H.J. Inc.*, 492 U.S. at 250, 109 S.Ct. at 2906 (finding that "numerous" racketeering acts over an "at least 6-year period" made it such that the petitioners might be able to prove closed-ended continuity). By contrast, the Fourth Circuit has affirmed the dismissal of a complaint alleging a single scheme over the course of four years, involving fifteen separate investments, three victims, and only monetary loss. *See Myers v. Finkle,* 758 F. Supp. 1102, 1113 (E.D. Va. 1990) *aff'd in part and rev'd in part,* 950 F.2d 165, 169 (4th Cir. 1991).

Here, CSI's Complaint in no way depicts of long-term criminal conduct. Even assuming that the submission of allegedly false declarations on three occasions over the course of one year (Compl. ¶¶ 40-42) could amount to fraud, it cannot be long-term criminal conduct. This is a fraction of the period found to be insufficient to allege closed-ended continuity in *Myers*, with fewer racketeering acts. By contrast, the schemes that were close calls or permitted a finding of closed-ended continuity in *H.J. Inc.* and *Walk* included several predicate acts and took place over the course of six and ten years. Here, three communications (none of which actually meet the definition of mail or wire fraud) over the course of one year do not amount to long-term criminal conduct. A short-lived, infrequent scheme of alleged misrepresentations cannot have the closed-ended continuity of a criminal enterprise subject to RICO.

Ultimately, CSI's claims concern the supposed breach of the Settlement Agreement. This cannot involve the type of long-term criminal conduct that RICO was enacted to police. Because CSI's claims are fundamentally claims arising under state law, they should be litigated in state court.

### D. A Supposed Scheme with One Victim—the Counterparty to a Settlement Agreement— Lacks the Scope of a "Pattern of Racketeering Activity."

To qualify as a "pattern of racketeering activity" under the RICO statute, a scheme need not only have sufficient continuity but also a sufficiently wide scope. Narrow schemes, targeting few victims and involving few fraudulent acts are not within the purview of RICO because there is not a distinct threat of long-term criminal activity. *Menasco, Inc.*, 886 F.2d at 684 (quoting *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902). When a RICO claim is based on "a single, non-recurring scheme to defraud a single entity by taking unfair competitive advantage in a quite narrow business context," it does not meet the pattern requirement. *Eastern Pub. and Advert. Inc. v. Chesapeake Pub. and Advert.*, 895 F.2d 971, 972 (4th Cir. 1990). Accordingly, narrowly focused schemes with limited threat to the social well-being do not satisfy the pattern requirement. *Al-Abood*, 217 F.3d at 238.

Requiring a broad scope of supposedly fraudulent activity by the defendant in a RICO claim avoids transforming every allegedly dishonest business practice into a cause of action under RICO. *See Flip Mortg. Corp.*, 841 F.2d at 538. In *Flip Mortgage*, a creditor of a computer services corporation brought a RICO action against the directors of the corporation for unpaid debts, alleging that for seven years, the company repeatedly and intentionally underreported its revenue that it was contractually obligated to share with the creditor. *Id.* at 533. Even though the creditor was deprived of money properly due to it on several occasions over a long period of time, its pleadings presented this series of events as part of a single scheme perpetrated by the defendants against a single victim. *Id.* at 538. The creditor even alleged that the defendants "never intended to abide by the contract's terms." *Id.* Yet because of "the unity and narrow focus of the scheme" the Fourth Circuit affirmed judgment in the defendants' favor. *Id.* Observing that the Fourth Circuit "will not lightly permit ordinary business contract or fraud

disputes to be transformed into federal RICO claims," the court reasoned that there was no pattern of racketeering activities and the dispute was best left to state law. *Id.*

Likewise in *Al-Abood*, the plaintiff filed a RICO action against former family friends, alleging that money that the plaintiff gave to the defendants for investment purposes was instead used for the defendants' own financial gain. *Al-Abood*, 217 F.3d at 230. In doing so, the defendants had made use of the mail and wires in furtherance of three discrete schemes over the course of several years. *Id.* at 238. Yet the Fourth Circuit affirmed judgment as a matter of law in favor of the defendants, reasoning that "the narrow focus of the scheme here—essentially a dispute between formerly close family friends—combined with commonplace predicate acts [mail and wire fraud]" did not satisfy the pattern requirement, particularly where "there was only one victim of the fraud." *Id.*

Here, CSI's attempts to convert a supposed single-victim scheme arising out of the alleged breach of a settlement agreement into a RICO claim should merit the same analysis and same end as those in *Flip Mortgage* and *Al-Abood*. These allegations do not warrant RICO treatment because they do not exceed what exists in customary fraud cases. Similar to the defendants in *Flip Mortgage* and *Al-Abood*, this case involves alleged mail or wire fraud directed to only one victim. Further, there is only one alleged scheme over the course of two years here, whereas there were three schemes in *Al-Abood* that took place over several years. The predicate acts alleged by CSI are the exact type of ordinary, garden-variety fraud that courts should avoid when faced with RICO claims. This is an ordinary, garden-variety business dispute whose determination has no implications outside the individual parties to this lawsuit. Holding that such allegations are sufficient to state a RICO claim would "threaten the ordinary run of commercial transactions," permit treble damage suits to be "brought against isolated offenders

- 13 -

for their harassment and settlement value," and eclipse "multiple state and federal laws bearing on transactions." *US Airline Pilots Ass'n,* 615 F.3d at 317.

Here, the Complaint precludes any conclusion that QMax and Perry engaged in a pattern of racketeering activity because of the narrow scheme described. CSI is both Plaintiff and sole alleged victim of Defendants breach of the Settlement Agreement. No amount of colorful description can take this garden-variety business dispute into the type of criminal behavior contemplated by RICO. As such, CSI's RICO claim must be dismissed.

### E. Because the Parties are Not Diverse and CSI Has Only Pled State Law Claims, this Action Should be Dismissed

In its complaint, CSI asserts claims for RICO, fraud, civil conspiracy, breach of contract, and unfair and deceptive trade practices. Comp. ¶¶ 85-127. Of these, only the RICO claim arises under federal law. Because the facts pled by CSI only allege an ordinary, garden-variety business dispute, rather than a RICO claim, this Court does not have subject matter jurisdiction over the lawsuit.

Federal courts are courts of limited jurisdiction, and as such, may only hear and decide cases when the Constitution or by federal statute grants that authority. *In re Bulldog Trucking, Inc.,* 147 F.3d 347, 352 (4th Cir. 1998). Courts have subject matter jurisdiction, and thus can hear a case, if there is federal question jurisdiction under 28 U.S.C. § 1331 or if there is diversity of citizenship under 28 U.S.C. § 1332. Where there is no valid basis for subject matter jurisdiction, the court must dismiss the action. *Id.*; Fed. R. Civ. P. 12(h)(3). If an action with mixed state and federal law claims begins in federal court, and eventually only the state law claims remain, the court should dismiss the action for lack of subject matter jurisdiction. *Chesapeake Bay Found., Inc. v. Va. State Water Control Bd.*, 495 F.Supp 1229, 1238 (4th Cir.

- 14 -

1980); *McMahan v. Jones*, No. 1:21-CV-10, 2021 WL 932031 at *1 (W.D.N.C. March 11, 2021).

Here, because CSI's complaint only alleges facts describing state law claims, there is no federal question jurisdiction under 28 U.S.C. § 1331. Moreover, the Complaint discloses that there can be no diversity jurisdiction under 28 U.S.C. § 1332 because CSI and QMax are both residents of North Carolina. (Compl. ¶¶ 6-7.) As a result, this Court should dismiss the action for lack of subject matter jurisdiction.

### III. CONCLUSION

CSI's RICO claim is precisely the type of claim that the Fourth Circuit has stated is outside of RICO's intended coverage. The Complaint's allegations foreclose applying RICO to this breach-of-contract dispute. The conduct alleged by CSI here does not and cannot rise to the level of "long-term, habitual criminal activity" at the center of RICO's focus. Rather, the conduct that CSI complains of is an ordinary contractual dispute, best dealt with by applicable state laws and litigated in state court. Because CSI has not pled a federal cause of action, this court should dismiss its claims.

This 1st day of November, 2021.

/s/ Brian L. Church

Brian L. Church
N.C. Bar No. 39581
BChurch@robinsonbradshaw.com

**ROBINSON, BRADSHAW & HINSON, P.A.**
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina  28246
Telephone:     704.377.2536
Facsimile:     704.378.4000

*Counsel for Defendants*

14410559