# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | |
|---|---|
| **CONTROLS SOUTHEAST, INC.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**QMAX INDUSTRIES, INC. and**<br>**THOMAS W. PERRY,**<br><br>**Defendants.** | **JURY TRIAL DEMANDED** |

## FIRST AMENDED COMPLAINT

Plaintiff Controls Southeast, Inc. ("CSI") brings this First Amended Complaint for unfair competition under the federal Lanham Act (15 U.S.C. § 1125), breach of contract, unfair and deceptive trade practices, fraud, conspiracy, and violation of the Racketeer Influenced and Corrupt Organizations Act, against Defendants QMax Industries, Inc. ("QMax") and Thomas W. Perry ("Perry") (collectively, "Defendants"), and alleges as follows:

## NATURE OF CASE

1. Plaintiff and Defendants were parties to an earlier case in this Court, captioned *Controls Southeast, Inc. v. QMax Industries, Inc. et al.*, Case No. 3:16-cv-00230-FDW-DSC ("CSI I").

2. In CSI I, QMax and Perry, along with their other co-defendants, were accused by CSI of trade secret misappropriation, breach of contract, and unfair competition. CSI presented evidence showing that Defendants misappropriated CSI's trade secrets and confidential

information, committed breach of contract, and unfairly competed with CSI. After over two years of litigation, CSI I was resolved by settlement.

3. The parties entered into a Settlement Agreement with an effective date of August 29, 2018. A true and correct copy of the Settlement Agreement is attached at Exhibit A.

4. QMax and Perry have breached the Settlement Agreement. Worse yet, QMax and Perry lied to CSI about their conduct, lied to CSI about existing contracts to be excluded from the terms of the Settlement Agreement, deceived CSI into believing that QMax and Perry were in compliance with the terms of the Settlement Agreement, and conspired with their distributors and representatives to commit fraud and unfair competition against CSI. Instead of complying with the terms of settlement to which they voluntarily agreed, QMax and Perry used the time since settlement to inflict further harm on CSI, deceive CSI as to their actions, deceive others as to their products, cost CSI money, and damage CSI's business through a brazenly unlawful scheme.

5. There is no justification for QMax's and Perry's unlawful conduct. CSI has suffered harm because of QMax's and Perry's unlawful acts. CSI respectfully petitions this Court for assistance in redressing the serious wrongs committed by QMax and Perry against CSI.

**PARTIES**

6. CSI is a corporation organized and existing under the laws of the State of North Carolina, with a principal place of business at 12201 Nations Ford Road, Pineville, North Carolina 28134.

7. QMax is a corporation organized and existing under the laws of the State of North Carolina, with a place of business at 520-A Eagleton Downs Dr, Pineville, North Carolina 28134.

8. Perry is a resident of Pennsylvania and is believed to live at 254 Lynn Haven Drive, Pittsburgh, Pennsylvania 15228.

### JURISDICTION AND VENUE

9. As part of the Settlement Agreement, the parties agreed as follows (Ex. A, ¶ 12.8):

> In the event of any dispute over this Agreement, any action to resolve such dispute shall be governed by and construed in accordance with the laws of the State of North Carolina. In any legal proceeding arising out of or relating to this Agreement, the parties consent to the exclusive jurisdiction of the state courts located in Mecklenburg County North Carolina and federal courts located in the Western District of North Carolina. Both parties expressly consent to and waive any objection to the personal jurisdiction and venue of these courts.

10. This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 and 15 U.S.C. § 1121.

11. Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because QMax and Perry are subject to personal jurisdiction in this judicial district.

12. QMax and Perry have submitted to the exclusive jurisdiction of this Court and waived any objections to personal jurisdiction and venue here.

### FACTS COMMON TO ALL COUNTS

13. As a key term to settle CSI I, QMax and Perry agreed in the Settlement Agreement to refrain from selling products in the "Sulphur Field," directly or indirectly, for a period of three years from the effective date, or until August 29, 2021. (Ex. A, ¶ 4.1). This three-year period is defined as the "Exclusionary Period." (Ex. A, ¶ 4.1). "Sulphur Field" is defined to mean "industrial processes such as sulphur recovery units and tail gas units, as well as

any process which concerns the manufacture, transportation, or storage of any component which includes over twenty percent (20%) elemental sulfur or hydrogen sulfide." (Ex. A, ¶ 1.2).

14. QMax and Perry agreed in the Settlement Agreement that "[d]uring the Exclusionary Period, QMax shall condition the sale of its products to its distributors and representatives in writing on the basis that no products sold by QMax to its distributors and/or representatives may be subsequently sold to, transferred to or otherwise used in the Sulphur Field." (Ex. A, ¶ 4.1.2).

15. QMax and Perry were required to "provide an annual declaration, attesting that neither has directly or indirectly sold into the Sulphur Field." (Ex. A, ¶ 4.1.3).

16. QMax and Perry agreed that "[a]ny breach of this Section 4.0 by any Defendant shall be a material breach of this Agreement." (Ex. A, ¶ 4.2).

17. As part of the Settlement Agreement, QMax and Perry agreed to pay CSI a certain percentage of gross revenues for a period of years. (Ex. A, ¶ 5.1).

18. QMax and Perry agreed that "[a]ny breach of this Section 5.1-5.4 by any Defendant shall be a material breach of this Agreement." (Ex. A, ¶ 5.6).

19. CSI maintained the right to verify compliance with the terms of the Settlement Agreement. (Ex. A, ¶ 4.1.3, ¶ 5.4).

20. QMax and Perry represented, warranted, and covenanted that "they will not use other Persons to circumvent the obligations and restrictions set forth in Sections 4 and 5" of the Settlement Agreement. (Ex. A, ¶ 11.5).

21. The parties agreed to a limited exception for four identified contracts, as follows (Ex. A, ¶ 4.1.1):

> Notwithstanding the restrictions set forth in Section 4.1, QMax may, during the Exclusionary Period, complete the backlog of 4 contracts (listed in Exhibit 2) that

it has in place as of August 24, 2018.  As a precondition to this limited exception, QMax shall first identify the parties and product quantities of these contracts to CSI.

22.     Exhibit 2 of the Settlement Agreement listed "Excepted Contracts" as follows (Ex. A, ex. 2):

**Excepted Contracts**

| Date | Buyer | End User Location | Amount |
|------|-------|-------------------|--------|
| 6/13/18 | UO Group | Deer Park, TX | $100,000 |
| 8/21/18 | UO Group | Deer Park, TX | $100,000 |
| 8/16/18 | Virginia Heat Transfer | Hopewell, VA | $30,000 |
| 8/22/18 | Zirco | Calgary, AB | $75,000 |

23.     QMax and Perry listed false information in Exhibit 2 of the Settlement Agreement.

24.     QMax and Perry listed contracts in Exhibit 2 of the Settlement Agreement that did not exist as of August 29, 2018, the effective date of the Settlement Agreement.

25.     As of August 29, 2018, QMax did not have a contract with UO Group dated June 13, 2018 for $100,000.

26.     As of August 29, 2018, QMax did not have a contract with UO Group dated August 21, 2018 for $100,000.

27.     As of August 29, 2018, QMax did not have a contract with Virginia Heat Transfer dated August 16, 2018 for $30,000.

28.     As of August 29, 2018, QMax did not have a contract with Zirco dated August 22, 2018 for $75,000.

29.     On information and belief, QMax and Perry listed these contracts in the Settlement Agreement as placeholders and without any sales orders in the amounts listed, in the

hopes that actual contracts and sales orders would be entered thereafter. Perry listed these contracts in the Settlement Agreement in order to prevent CSI from making these sales.

30. QMax and Perry did not inform CSI that no contracts or sales orders existed for the Excepted Contracts listed in the Settlement Agreement. In fact, QMax and Perry led CSI to believe that contracts had been entered, given the representation in the Settlement Agreement that QMax had a "backlog" of four "contracts" that it "has in place" as of August 24, 2018.

31. The statements and representations in the Settlement Agreement about QMax's Excepted Contracts were materially false.

32. The restrictions on Defendants set forth in Section 4.0 of the Settlement Agreement were a material term of settlement.

33. Defendants voluntarily entered into the Settlement Agreement, after receiving advice of their own counsel, and with full knowledge of and consent to the terms to which they agreed.

34. Defendants agreed to voluntarily exit the market for steam tracing solutions in the Sulphur Field during the Exclusionary Period as part of the Settlement Agreement.

35. Pursuant to Section 4.1.1 of the Settlement Agreement, QMax did not first identify the "parties and product quantities" of any contracts to CSI.

36. Pursuant to Section 4.1.1 of the Settlement Agreement, QMax has never first identified the "parties and product quantities" of any contracts to CSI.

37. QMax and Perry did not satisfy, and have never satisfied, the precondition to the limited exception in Section 4 of the Settlement Agreement.

38. Perry submitted a declaration signed on November 18, 2019, swearing under penalty of perjury that "I and QMax have complied with all of the requirements of Section 4.0 of

the Settlement Agreement . . . Neither I nor QMax has directly or indirectly sold into the Sulfur Field since the execution of the Settlement Agreement (with the exception of the projects listed on the agreement)." A true and correct copy of this declaration is attached at Exhibit B.

39. Perry submitted a declaration signed on May 26, 2020, swearing under penalty of perjury that "Neither I nor QMax has quoted, marketed and/or sold products into the Sulfur Field (as that term is defined in Section 1.2 of the Agreement), either directly or indirectly since the execution of the Settlement Agreement (with the exception of the contracts listed in Exhibit 2 to the Agreement)." A true and correct copy of this declaration is attached at Exhibit C.

40. Perry submitted a declaration signed on November 16, 2020, swearing under penalty of perjury that "I and QMax have complied with all of the requirements of Section 4.0 of the Settlement Agreement . . . Neither I nor QMax has directly or indirectly sold into the Sulfur Field since the execution of the Settlement Agreement (with the exception of the projects listed on the agreement)." A true and correct copy of this declaration is attached at Exhibit D.

41. The November 18, 2019 declaration contained one or more false statements.

42. The May 26, 2020 declaration contained one or more false statements.

43. The November 16, 2020 declaration contained one or more false statements.

44. Perry represented to CSI that he sent a letter to all of QMax's representatives dated September 12, 2018, notifying them of their restrictions of selling into the Sulphur Field.

45. Perry represented to CSI that he sent a press release to all of QMax's customers dated September 17, 2018, notifying them of their restrictions of selling into the Sulphur Field.

46. QMax's representatives include Texas Steam, UO Group, Steam Solutions, LA Steam and/or Mr. Jay D'Amico.

47. After the parties entered into the Settlement Agreement, and based on representations and sworn statements provided by Perry, CSI believed that QMax and Perry were complying with their settlement obligations. Unbeknownst to CSI, QMax and Perry were engaged in a massive fraud to deceive, and unfairly compete with, CSI.

48. During the Exclusionary Period, and despite the restrictions contained in the Settlement Agreement, QMax and Perry were working with Texas Steam, Steam Solutions, UO Group and/or Mr. Jay D'Amico on a new tracing project at the Shell refinery in Deer Park, Texas.

49. A project at the Shell refinery in Deer Park, Texas on Sulfur Tank (T-93401) was installed/completed after August 29, 2018 with tracing from QMax.

50. An order was placed after August 29, 2018 for tracing from QMax for a sulfur transfer line project at the Shell refinery in Deer Park, Texas.

51. On information and belief, a scope of work document was issued on or about January 22, 2020, for tracing for a sulfur transfer line project at the Shell refinery in Deer Park, Texas.

52. On information and belief, a purchase order was issued on or about February 19, 2020, for tracing for a sulfur transfer line project at the Shell refinery in Deer Park, Texas.

53. On information and belief, QMax has supplied or is in the process of supplying the Shell refinery in Deer Park, Texas with tracing in the "tube over channel" geometry introduced by QMax after the effective date of the Settlement Agreement.

54. QMax's supply of products with the "tube over channel" geometry to the Shell Refinery in Deer Park, Texas after the effective date of the Settlement Agreement was not part of the backlog of contracts listed in Exhibit 2 of the Settlement Agreement.

55.     The sales of QMax products for the Shell refinery in Deer Park, Texas were in the Sulphur Field during the Exclusionary Period, as defined in the Settlement Agreement.

56.     QMax and Perry, and its distributors and representatives, were prohibited from selling products to the Shell refinery in Deer Park, Texas for a sulfur transfer line and/or sulfur tank, including Sulfur Tank T-93401, from August 29, 2018 until August 29, 2021.

57.     During the Exclusionary Period, and despite the restrictions contained in the Settlement Agreement, QMax and Perry were working with LA Steam on a new tracing project at the Calumet facility in Shreveport, Louisiana.

58.     In or around April/May 2021, LA Steam offered to sell and/or sold tracing from QMax for use in a sulfur application.

59.     On information and belief, QMax and Perry were aware of and involved in the offer for sale and/or sale of products by LA Steam to the Calumet facility in Shreveport, Louisiana in or around April/May 2021.

60.     The Calumet facility in Shreveport, Louisiana was not part of the backlog of contracts listed in Exhibit 2 of the Settlement Agreement.

61.     The sales and/or offers for sale of QMax products for the Calumet facility in Shreveport, Louisiana were in the Sulphur Field during the Exclusionary Period, as defined in the Settlement Agreement.

62.     QMax and Perry, and its distributors and representatives, were prohibited from selling products to the Calumet facility in Shreveport, Louisiana for use in the Sulphur Field, from August 29, 2018 until August 29, 2021.

63.     After entering into the Settlement Agreement, and with full knowledge of its terms and restrictions, QMax and Perry intentionally violated the terms thereof.  Indeed, on

information and belief, QMax and Perry never had any intention of complying with their obligations under the Settlement Agreement. Defendants' post-settlement conduct had the effect Defendants intended—to lull CSI into believing that Defendants were complying with the settlement terms so that they could make sales instead of CSI.

64. CSI previously provided a proposal to Shell and the customer of Zirco.

65. CSI, either alone or through its related companies, had existing relationships with Shell, Texas Steam, UO Group, Zirco, the customer of Zirco, the Calumet facility, and Jay D'Amico.

66. Defendants' false statements when entering into the Settlement Agreement, failure to comply with the Settlement Agreement, and Perry's false declarations and correspondence since the Settlement Agreement led CSI to lose at least four contracts, including one with Zirco, two with Shell, and the contract for the Calumet facility.

67. In a letter dated May 19, 2020, CSI, through counsel at Ametek, informed Perry that CSI believed that QMax and Perry were in violation of their obligations under the Settlement Agreement. A true and correct copy of this letter is attached at Exhibit E.

68. Perry responded to CSI in a letter dated May 27, 2020. A true and correct copy of this letter with attachments is attached at Exhibit F. In this letter, Perry stated as follows:

The letter you sent dated May 19, 2020 comes to a surprise to QMax. I can assure you that QMax and its employees take this agreement seriously and work to honor the agreement. Since the agreement was signed on or about August 29, 2018, QMax has taken several steps to ensure we do not directly or indirectly sell any of our systems into the Sulphur field as outlined by the agreement.

1) As shown in the attachments, a letter was sent to all of our representatives, including Texas Steam, and a Press Release to all of our customers, including Texas Steam notifying them of our restriction of selling into the Sulphur Field.

2) As shown in the attachments, a condition of our sale is the acknowledgement of not selling into the Sulphur Field. These terms are listed on all proposals and estimates.

3) Every November through 2021 a Declaration that I, Tom Perry, have signed and notarized stating our compliance with this agreement is sent to Ametek. A further Declaration as sent by Ametek is also attached.

4) We keep records of all sales, even those refused during this restriction, and have zero records showing any of our products being sold into the Sulphur Field since the date the agreement went into effect.

69. CSI, through outside legal counsel (Mark Wilson at Moore & Van Allen), sent Perry another letter dated December 16, 2020, regarding QMax's and Perry's breach of the Settlement Agreement. A true and correct copy of this letter is attached at Exhibit G.

70. Perry responded to Mr. Wilson in an email dated December 22, 2020. A true and correct copy of this email is attached at Exhibit J. In this email, Perry stated as follows:

We have reviewed your letter. QMax has not breached the settlement agreement. The alleged actions of Jay D'Amico and his companies are not known to QMax. We have done everything in our control to prevent the sale of our products into the sulfur industry as outlined by our August 29, 2018 Settlement Agreement. We have kept excellent records to ensure our products are not used in the sulfur industry. Examples of what we have done to comply are;

1) Informed in writing to all of our customers and Channel Partners that we will not be selling any of our products into the sulfur industry until Sept 1, 2021.
2) Writing on all Estimates and Sales Orders that as a condition of sale, our products will not be used in the sulfur industry.
3) On every order, we ask our customers and Channel Partners what service our products will be used in and getting it in writing from the purchaser. If the service is sulfur, we refuse the sale.
4) Prior to the settlement agreement, we attended sulfur related trade shows and events. After the agreement, we have not attended any sulfur related events.

71. CSI, through outside legal counsel (Mr. Wilson), sent a response to Perry in an email dated January 4, 2021. Mr. Wilson's January 4, 2021 email requested Perry to provide

documents related to the Excepted Contracts listed in Exhibit 2 of the Settlement Agreement and records related to Texas Steam, UO Group, and LA Steam.

72. Perry responded to CSI in an email dated January 7, 2021. A true and correct copy of this email is attached at Exhibit H. In this email, Perry stated as follows:

I've further investigated this alleged sale of QMax products into the sulfur industry by the companies owned by Jay D'Amico by speaking with Mr. D'Amico and reviewing our sales records. We have concluded after this investigation that all sales we made to Mr. D'Amico's companies complied with the requirements of the settlement agreement. While the detail you have provided to date is not sufficient for anyone to identify the date and location of the installation you have challenged, our investigation has revealed that any installation of QMax's newer product in a sulfur application would have been the result of a customer-facilitated change order within the terms of the contracts identified in Exhibit 2 in the Settlement Agreement. QMax has not knowingly made sales for sulfur applications outside those expressly excepted contracts.

73. The limited exception in the Settlement Agreement did not include "customer-facilitated change order[s]."

74. "QMax's newer product" has been installed "in a sulfur application" during the Exclusionary Period set forth in the Settlement Agreement.

75. Perry's email dated January 7, 2021, shows that Perry and Mr. Jay D'Amico were working together after August 29, 2018, including in their sales of QMax products and in their communications with CSI.

76. Defendants, either on their own or through their distributors and representatives, concocted a scheme to falsely claim prohibited sales were "change orders" in order to try to circumvent the terms of the Settlement Agreement.

77. Defendants falsely claimed contracts that did not exist and/or artificially stated contract values in order to falsely claim that prohibited sales were part of Excepted Contracts under the Settlement Agreement.

78. Defendants' actions show that they had no intentions of abiding by the terms of the Settlement Agreement since before it was even executed.

79. Defendants, either on their own or through their distributors and representatives, sold products in the Sulphur Field during the Exclusionary Period.

80. Defendants knew or had reason to know that products they sold during the Exclusionary Period were for the Sulphur Field.

81. Defendants, in conjunction with their distributors and representatives, knew or had reason to know that products sold for installation at the Shell refinery in Deer Park, Texas were in the Sulphur Field during the Exclusionary Period.

82. Defendants, in conjunction with their distributors and representatives, knew or had reason to know that products sold for installation at the Calumet facility in Shreveport, Louisiana were in the Sulphur Field during the Exclusionary Period.

83. Defendants, in conjunction with their distributors and representatives, conspired to use, and in fact have used, "change orders" to circumvent the restrictions in the Settlement Agreement.

84. Defendants, in conjunction with their distributors and representatives, made false representations to CSI, and intentionally misled CSI, through communications sent via mail and/or wire, about the facts concerning Defendants' sales of products during the Exclusionary Period.

85. CSI relied on Defendants' representations, several of which were made under oath in sworn declarations, that Defendants and their distributors and representatives had not sold products into the Sulphur Field during the Exclusionary Period.

86. On at least five occasions between August 29, 2018 and January 7, 2021, Defendants made false and misleading statements intending to deceive CSI into believing that

Defendants and their distributors and representatives had not sold products that they were prohibited from selling. These five occasions included:

 a. Perry's November 18, 2019 declaration. (Ex. B).

 b. Perry's May 26, 2020 declaration. (Ex. C).

 c. Perry's November 16, 2020 declaration. (Ex. D).

 d. Perry's email dated December 22, 2020 to Mark Wilson. (Ex. J).

 e. Perry's email dated January 7, 2021 to Mark Wilson. (Ex. H).

87. The Settlement Agreement contains an audit provision (Ex. A, ¶ 7.0), which includes the following:

> 7.3 Upon reasonable request by CSI, Defendants shall provide access to the Accounting System to a third party auditor selected by CSI. The Accounting System, and all supporting or underlying documents and materials shall be made available to the auditor during normal business hours. All information disclosed in connection with this section shall be used only for purposes of verifying compliance with this Agreement and, absent a difference in the amount reported by Defendants and the amount determined by the auditor or other discrepancy, no information obtained during any audit shall be disclosed to CSI.
>
> 7.4 The cost of any audits conducted under Section 7.0 shall be borne by CSI, unless the audit identifies either that Defendants: 1) have underpaid CSI by more than one-half of one percent (.5%); or 2) sold any goods into the Sulphur Field during the Exclusionary Period. In either instance, Defendants shall reimburse CSI for the total costs of the audit.

88. CSI invoked the audit provision in the Settlement Agreement and requested documents from Defendants through third party auditors at Dixon Hughes Goodman LLP.

89. Defendants refused to make available all supporting and underlying documents and materials to verify compliance with the Settlement Agreement.

90. The audit took several months and CSI was forced to incur the costs of the audit. CSI should not have been forced to incur these costs.

91. The auditors prepared a report, which was sent to Perry on May 28, 2021 for his review and to allow him to provide responses to each of their findings. Perry sent an email dated June 2, 2021 to the auditors (specifically Jennifer Walton at Dixon Hughes) providing his responses to each of the findings. A true and correct copy of this email is attached at Exhibit K.

92. In his responses, Perry made false statements regarding the Excepted Contracts listed in Exhibit 2 of the Settlement Agreement, which did not actually exist prior to the execution of the Settlement Agreement. Perry also referenced his use of "change orders" to circumvent the restrictions of the Settlement Agreement.

93. The Settlement Agreement did not allow Defendants to use change orders to circumvent the terms of settlement.

94. Defendants have breached their contractual obligations, lied under oath to CSI, lied to CSI's outside legal counsel, lied to CSI's auditors, conspired with Defendants' distributors and representatives to harm CSI, and acted with malicious intent to unfairly and deceptively compete with CSI.

95. Also as part of the Settlement Agreement, Defendants assigned to CSI all right, title and interest in and to certain intellectual property rights, including certain patents and patent applications and all inventions disclosed therein. The assigned inventions included rights to the product sold by Defendants at that time with a channel over tube design.

96. The assignment in the Settlement Agreement was a material term of settlement.

97. Google searches for "QMax sulfur", "sulfur QMax Industries", "steam solutions sulfur", and "steam leaks sulfur" prove that QMax was still marketing the channel over tube design, including into the Sulfur Field, during the Exclusionary Period.

98. Defendants actions have been contrary to their words, with Perry telling CSI, often under oath, that Defendants were complying with the Settlement Agreement while, at the same time, Defendants acted in complete disregard of the settlement terms. From declarations and correspondence claiming compliance intentionally transmitted to CSI, on the one hand, to false contracts, change orders, and continued sales and offers into the Sulfur Field during the Exclusionary Period, on the other hand, Defendants have exhibited a pattern of bad acts based in deception and lies, while they say one thing while doing another.

99. As further evidence of the bad acts of Defendants, Defendants have a made false designation of origin, false or misleading description of fact, or false or misleading representation of fact about their products in violation of federal law since entering into the Settlement Agreement.

100. After the Settlement Agreement, Defendants changed the design of their product from a channel over tube design to a tube over channel design. However, Defendants have continued to falsely represent that they are making and selling the exact same product they previously sold, the rights to which they assigned to CSI as part of the Settlement Agreement, even though Defendants' products are now a different design. For example, Defendants' website still displays the channel over tube design in several places. Below are examples of the false and misleading pictures from the Defendants' website:



([https://www.qmaxindustries.com/sulfur-industry-products](https://www.qmaxindustries.com/sulfur-industry-products)) (showing channel over tube design)



([https://www.qmaxindustries.com/qmax-fts-tank-heating-system](https://www.qmaxindustries.com/qmax-fts-tank-heating-system)) (showing channel over tube design).  In contrast Defendants' tube over channel design is properly reflected in the picture below:



(https://www.qmaxindustries.com/qmax-fts-steam).

101.    Defendants are not authorized by CSI to advertise, promote, offer for sale or sell the channel over tube product design shown on Defendants' website.

102.    Defendants' new product design, the tube over channel design, introduces an additional layer of heat transfer compound between the steam tube and process pipe, which causes the product to be less efficient than the channel over tube design owned by CSI.

103.    Defendants are not only showing a product design that they do not own and have no rights to sell, but they are also using false data to sell their new product design.

104.    The heat transfer comparison data listed on Defendants' website is for CSI's channel over tube product, not Defendants' tube over channel product.

105.    Defendants are not telling customers and prospective customers that their new product design is not the same as their prior design or that the product design they are offering in their promotional materials is not their own but, instead, is CSI's product.  In fact, like other

instances of Defendants saying one thing and doing another, Defendants have continued to use the same promotional materials and data to perform the proverbial bait-and-switch—advertise one product, claiming it to be your own when it is not, and sell customers another, different product.

106. CSI and Defendants compete for sales of steam tracing products. There are a limited number of domestic providers of steam tracing solutions.

107. On information and belief, Defendants want customers and prospective customers to purchase or consider purchasing Defendants' products based, at least in part, on the information shown in Defendants' promotional materials, including their website.

108. Defendants provide heat transfer comparison data, including as shown on their website, to influence customer purchasing decisions for steam tracing products.

109. Defendants have not updated their website to reflect the data on their new product design. For example, the data shown below falsely suggests that Defendants' new tube over channel product is the same as the channel over tube product, given that the data has never been changed despite Defendants' change in product design:



(https://www.qmaxindustries.com/qmax-fts-steam) (current website). *Compare* to Exhibit I (website on 4/27/2016).

110. On information and belief, Defendants have made sales in competition with CSI based, at least in part, on the information provided by Defendants, including the information shown on Defendants' website.

111. On information and belief, customers and prospective customers have viewed Defendants' information, including its product design photos and heat transfer data, and purchased product from Defendants instead of from CSI. This has caused harm to CSI.

**COUNT I**
**FALSE DESIGNATION OF ORIGIN**
**(AGAINST ALL DEFENDANTS)**

112. The allegations in the preceding paragraphs are incorporated herein by reference.

113. Defendants are falsely claiming that the channel over tube design, as shown on their website, is their own, when in fact it is owned by CSI.

114. CSI, and not Defendants, have the rights to the channel over tube design being advertised by Defendants.

115. CSI is the only authorized provider of the channel over tube product shown on Defendants' website, falsely and misleadingly, as originating with them.

116. Defendants' conduct, as described above, is likely to cause confusion, to cause mistake, and/or to deceive the public as to the ownership of the channel over tube design that is displayed on Defendants' website.

117. Defendants' conduct, as described above, is likely to cause confusion, to cause mistake, and/or to deceive as to the affiliation, connection, or association of Defendants with CSI, or as to the origin, sponsorship, or approval of Defendants' goods, services, or commercial activities by CSI.

118. Due to Defendants' conduct, customers are likely to believe that Defendants are the source of the channel over tube design when, in fact, they are not.

119.     Customers and prospective customers are likely to be confused as to whether Defendants are selling or may sell CSI's product, which they are not authorized to do.

120.     Defendants' conduct, as described above, constitutes the use in commerce of false designations of origin, in violation of 15 U.S.C. § 1125 (a)(1)(A).

121.     CSI has been and will be injured as a direct and proximate result of Defendants' false designation of origin in that customers are likely to be confused or mistaken about the true source of the channel over tube design and Defendants' ability, or lack thereof, to sell such a design, and will be deceived into purchasing Defendants' inferior tube over channel product believing it is the channel over tube product owned by CSI.  This likelihood is exacerbated by Defendants' false data, which has not been changed even though its product design is now different.  Defendants' misrepresentations have deprived CSI of the goodwill that would stem from public knowledge of the true source of the channel over tube product.

### COUNT II
### FALSE ADVERTISING
### (AGAINST ALL DEFENDANTS)

122.     The allegations in the preceding paragraphs are incorporated herein by reference.

123.     Defendants' website displaying the channel over tube design is a false and/or misleading statement of fact as it does not represent the characteristics or qualities of Defendants' product.

124.     The heat transfer comparisons provided on Defendants' website are also false and/or misleading statements of fact as they do not represent the characteristics or qualities of Defendants' product.

125.     Defendants' website is a commercial advertisement that places the false and/or misleading statements of fact in interstate commerce.

126.     Defendants' website is likely to deceive the public as to the origin of the channel over tube design and likely influence customers to purchase Defendants' tube over channel product believing it is the channel over tube product owned by CSI.

127.     Defendants' website is also likely to deceive the public as to the actual heat comparisons for its tube over channel product and likely influence customers to purchase Defendants' tube over channel product believing it has the same heat comparisons as the channel over tube product.

128.     On information and belief, Defendants have delivered tube over channel product to customers that believed they were purchasing channel over tube product or, at a minimum, product that was the same or equivalent to channel over tube product.

129.     Defendants' conduct, as described above, constitutes false advertising in violation of 15 U.S.C. § 1125 (a)(1)(B).

130.     CSI has been and will be injured as a direct and proximate result of Defendants' false advertising due to lost sales resulting from customers' misunderstanding of the performance and design of Defendants' product.

## COUNT III
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### (AGAINST PERRY)

131.     The allegations in the preceding paragraphs are incorporated herein by reference.

132.     Under 18 U.S.C. § 1961(3) a "person" for the purposes of the Civil RICO Statute is defined as "any individual or entity capable of holding a legal or beneficial interest in a property."

133. Under 18 U.S.C. § 1961(4) the term "enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

134. Perry is a "person" within the meaning of the RICO statute.

135. QMax constitutes an "enterprise" within the meaning of the RICO statute as it is a corporation organized and existing under the laws of the State of North Carolina. Perry is the President of QMax.

136. The enterprise is separate and distinct from Perry, who participated in the enterprise and directed its affairs.

137. Under 18 U.S.C. § 1962 (c) it is unlawful for any person to conduct or participate in the conduct of the affairs of an enterprise that is engaged in or affects interstate or foreign commerce through a pattern of racketeering activity.

138. QMax is an enterprise engaged in and whose activities affect interstate commerce. Perry is employed by or associated with the enterprise.

139. Perry agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.

140. Pursuant to and in furtherance of the fraudulent scheme, Perry committed multiple related acts of fraud against Plaintiff through false and misleading statements to Plaintiff, sent via mail/wire, including the November 18, 2019, May 26, 2020, and November 16, 2020 declarations, with the intention of concealing the enterprises unlawful conduct.

141. Perry communicated with distributors and representatives, and others, over mail/wire, including the September 12, 2018 memorandum and September 17, 2018 press release, in furtherance of the fraudulent conduct.

142. The predicate acts of racketeering activity engaged in by Perry and those acting in concert with him or under his direction, include but are not limited to participation in a scheme to defraud by use of interstate mail/wire (18 U.S.C. § 1343), as alleged herein. The elements of a mail/wire fraud offense are: (1) a scheme to defraud and (2) the use of the mails/wire communications affecting interstate or foreign commerce in furtherance of the scheme.

143. Perry, while in Pennsylvania, sent information related to the listed contracts in Exhibit 2 of the Settlement Agreement via mail/wires to CSI in North Carolina in furtherance of the scheme. Perry represented to CSI that the contracts in Exhibit 2 were in place before the effective date of the Settlement Agreement. The contracts did not exist as of August 29, 2018, the effective date of the Settlement Agreement. Perry made the representations about the contracts listed in Exhibit 2 in order to prevent CSI from obtaining these contracts.

144. Perry, while in Pennsylvania, also sent the November 18, 2019, May 26, 2020, and November 16, 2020 declarations via mail/wires to CSI in North Carolina in furtherance of the scheme. Each of the declarations contained false statements of compliance with the Settlement Agreement as QMax continued to sell into the Sulphur Field during the Exclusionary Period. These false statements from Perry misled CSI into believing that Defendants were in compliance with the Settlement Agreement.

145. Perry, while in Pennsylvania, also sent an email to Mr. Wilson in North Carolina on December 22, 2020 in furtherance of the scheme. (Ex. J). Mr. Wilson, as counsel for Plaintiff, corresponded with Perry regarding QMax's breaches of the Settlement Agreement and

proposed remedial measures. Perry's December 22, 2020 email was in response to a December 16, 2020 letter from Mr. Wilson. Perry stated "On every order, we ask our customers and Channel Partners what service our products will be used in and getting it in writing from the purchaser. If the service is sulfur, we refuse the sale. . . . If any QMax products have allegedly been sold into the sulfur industry, it has been done through deceptive actions against QMax." (*Id.*). This statement is false as QMax continued to sell into the Sulphur Field during the Exclusionary Period.

146. Perry, while in Pennsylvania, also sent an email to Mr. Wilson in North Carolina on January 7, 2021 in furtherance of the scheme. (Ex. H). In response to Perry's December 22, 2020 email, Mr. Wilson sent an email to Perry on January 4, 2021 to request documents related to the Excepted Contracts listed in Exhibit 2 of the Settlement Agreement and records related to Texas Steam, UO Group, and LA Steam. Perry's January 7, 2021 email was in response to Mr. Wilson's January 4, 2021 email. Perry failed to produce any documentation or records. Instead, Perry stated "our investigation has revealed that any installation of QMax's newer product in a sulfur application would have been the result of a customer-facilitated change order within the terms of the contracts identified in Exhibit 2 in the Settlement Agreement. QMax has not knowingly made sales for sulfur applications outside those expressly excepted contracts." (*Id.*). This statement is false as the sales were not the result of a change order and QMax knowingly sold into the Sulphur Field during the Exclusionary Period beyond the Exhibit 2 Excepted Contracts.

147. Perry, while in Pennsylvania, also sent an email to Jennifer Walton (auditor at Dixon Hughes) in North Carolina on June 2, 2021 in furtherance of the scheme. (Ex. K). Plaintiff was forced to engage auditors to investigate QMax's sales in breach of the Settlement

Agreement, as Perry would not otherwise provide documentation and records for review. Plaintiff engaged auditors at Dixon Hughes Goodman LLP to investigate Defendants' compliance with the Settlement Agreement. Over the course of several months, the auditors worked with Perry to collect documentation. The auditors prepared a report, which they sent to Perry on May 28, 2021 for his review and to allow him to provide responses to each of their findings. Perry's June 2, 2021 email provided his responses to each of the findings. In his responses, Perry made false statements regarding the Excepted Contracts listed in Exhibit 2 of the Settlement Agreement, which did not actually exist prior to the execution of the Settlement Agreement. (*Id.*). Perry also referenced his use of "change orders" to circumvent the restrictions of the Settlement Agreement. (*Id.*).

148. Perry's actions described in paragraphs 143-147 above are each violations of 18 U.S.C. § 1343.

149. Perry violated RICO by engaging in a longstanding pattern of racketeering activity in support of the enterprise, including the seven predicate acts described above, which occurred over the course of almost three years.

150. Perry agreed and conspired with QMax employees to violate 18 U.S.C. § 1962 (c) through his pattern of racketeering activities in violation of 18 U.S.C. § 1962 (d). Perry knew that his predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

151. The acts set forth herein constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961.

152. Perry has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described herein, in violation of 18 U.S.C. § 1962 (c).

153. As a direct and proximate result of Perry's racketeering activities and violations of 18 U.S.C. §§ 1962 (c) and (d), Plaintiff's business has been injured.

154. Plaintiff's business was injured by reason of these violations in that as a direct and proximate result of Perry's acts, Plaintiff suffered damages, as alleged herein. As a result of Perry's acts, Plaintiff has lost sales and/or not received accurate royalty payments. Plaintiff has also incurred the cost of the audit.

155. There are a limited number of domestic providers of steam tracing solutions. QMax voluntarily exited the market for steam tracing solutions in the Sulphur Field through the Settlement Agreement. Unbeknownst to Plaintiff, QMax continued to compete for contracts in the Sulphur Field.

156. Perry misled Plaintiff into believing that QMax had contracts with UO Group and Zirco prior to the Settlement Agreement when QMax did not have such contracts. Perry's false statements prevented Plaintiff from pursuing contracts with UO Group, Zirco, and/or the customers of UO Group and Zirco. Plaintiff lost these sales as a proximate result of Perry's false statements.

157. Due to Perry's false statements, Plaintiff lost at least four contracts, including with Zirco, two with Shell, and the contract for the Calumet facility. The total value of these contracts is believed to be hundreds of thousands of dollars.

158.    Plaintiff had previously provided a proposal to Shell and the customer of Zirco. Plaintiff would have been successful in obtaining new contracts with these customers.  Plaintiff's loss of these contracts was a proximate result of Perry's false statements.

159.    Plaintiff, either alone or through its related companies, had existing relationships with Shell, Texas Steam, UO Group, Zirco, the customer of Zirco, the Calumet facility, and Jay D'Amico.  As a proximate result of Perry's false statements, Plaintiff was prevented from making additional sales of products.

160.    By reason of Perry's violations as specified above, Plaintiff is entitled to three times actual damages pursuant to 18 U.S.C. § 1964, with interest thereon from the date of loss and reasonable attorneys' fees.

### COUNT IV
### FRAUD
### (AGAINST ALL DEFENDANTS)

161.    The allegations in the preceding paragraphs are incorporated herein by reference.

162.    Defendants intentionally included false material facts as part of the Settlement Agreement, specifically concerning Excepted Contracts listed in the Settlement Agreement.

163.    Since the entry of the Settlement Agreement, Defendants have committed fraud by intentionally and falsely representing that they were in compliance with the Settlement Agreement terms and conditions.

164.    In furtherance of their fraud, Defendants submitted one or more false declarations to Plaintiff and several additional correspondences, as described above, that were blatantly false and misleading.

165.    Plaintiff relied on Defendants false representations, to its detriment.

166. Defendants' false representations were material to (1) Plaintiff entering into the Settlement Agreement, and (2) Plaintiff continuing under the Settlement Agreement while Defendants were not in compliance.

167. Defendants, and each of them, conspired to commit fraud as alleged herein, in that Defendants, with their distributors and representatives, conspired to deceive Plaintiff concerning sales of products into the Sulphur Field during the Exclusionary Period.

168. Defendants have continued their fraud through the audit process, in which they concealed and lied about contracts and sales that were prohibited by the Settlement Agreement.

169. Defendants fraudulent conduct was committed in furtherance of their own interests, and was intentional, willful, malicious, wanton, and oppressive, and done with conscious and callous disregard for the consequences, and with the specific intent to harm Plaintiff.

170. Plaintiff has suffered harm as a result of Defendants' fraudulent conduct.

171. Plaintiff is entitled to an award of punitive damages from Defendants and each of them in an amount to be proven at trial, sufficient to punish, penalize and deter Defendants from engaging in such conduct in the future.

### COUNT V
### CIVIL CONSPIRACY / FACILITATION OF FRAUD
### (AGAINST ALL DEFENDANTS)

172. The allegations in the preceding paragraphs are incorporated herein by reference.

173. Defendants conspired with each other and/or with their distributors and representatives to fraudulently and deceptively (1) convince Plaintiff to enter the Settlement Agreement, and (2) sell products in unlawful competition with Plaintiff.

174. In furtherance of the conspiracy, Defendants made false representations in the Settlement Agreement concerning its alleged contracts with certain third parties.

175. Also in furtherance of the conspiracy, Defendants made false representations in communications with Plaintiff, including in the declarations dated November 18, 2019, May 26, 2020, and November 16, 2020, and correspondence about the Settlement Agreement terms and conditions.

176. Defendants, and their distributors and representatives, capitalized on their fraud by obtaining dismissal of Plaintiff's claims made against them in CSI I, and by selling products, and thus profiting from sales of products, that they were prohibited from selling.

177. Plaintiff has suffered harm as a result of Defendants' fraudulent conduct.

## COUNT VI
### BREACH OF CONTRACT
### (AGAINST ALL DEFENDANTS)

178. The allegations in the preceding paragraphs are incorporated herein by reference.

179. The Settlement Agreement is a valid and enforceable contract.

180. Defendants breached their contractual obligations under the Settlement Agreement.

181. Defendants breached Sections 4, 5 and 7 of the Settlement Agreement.

182. Plaintiff has been harmed by Defendants' conduct, as alleged herein, and is entitled to relief, as requested herein.

183. Plaintiff is entitled to recover from Defendants, and each of them, such compensatory and/or punitive damages as will be proven at trial.

184. In addition to the above, Plaintiff is entitled to recover the total costs of the audit pursuant to Section 7.4 of the Settlement Agreement.

**COUNT VII**
**UNFAIR AND DECEPTIVE TRADE PRACTICES**
**(AGAINST ALL DEFENDANTS)**

185. The allegations in the preceding paragraphs are incorporated herein by reference.

186. Defendants' acts as alleged herein have been willful, reckless, wanton, egregious, unfair, unethical, deceptive, and unscrupulous.

187. Defendants' conduct, which is in or affecting commerce, constitutes unfair methods of competition and/or unfair and deceptive acts or practices, within the meaning of North Carolina General Statutes § 75-1.1 and North Carolina common law.

188. Plaintiff has been damaged by Defendants' conduct and is entitled to monetary and injunctive relief pursuant to North Carolina General Statutes § 75 et seq. and other applicable law, such relief includes an award of monetary damages, including the amount of the actual losses caused to Plaintiff by Defendants' unfair competition, lost profits, disgorgement of the unfair gains and other unjust enrichment benefiting Defendants, attorneys' fees and costs pursuant to North Carolina General Statutes § 75-16.1, and treble damages pursuant to N.C. Gen. Stat. § 75-16, together with any and all amounts to be shown at trial.

**PRAYER FOR RELIEF**

In view of the foregoing, CSI asks that this Court grant the following relief:

A. Find the Defendants violated the federal Lanham Act;

B. Find that Perry violated the Racketeer Influenced and Corrupt Organizations Act;

C. Find that Defendants breached the Settlement Agreement;

D. Find that Defendants committed fraud and conspired to facilitate fraud, against Plaintiff;

E.  Find that Defendants have committed unfair and deceptive acts in violation of North Carolina statutory law;

F.  Order an accounting and render judgment against Defendants for all profits wrongfully derived by Defendants by their unfair and deceptive acts;

G.  Order an accounting and render judgment against Defendants for all profits wrongfully derived by Defendants;

H.  Order Defendants to disgorge to CSI all wrongfully derived profits;

I.  Award all damages adequate to compensate CSI for Defendants' unlawful acts;

J.  Award Plaintiff the total costs of the audit;

K.  Award CSI punitive damages;

L.  Award CSI treble damages pursuant to N.C. Gen. Stat. § 75-16.

M.  Award CSI its costs and reasonable attorneys' fees to the extent permitted by law;

N.  Award CSI prejudgment and post-judgment interest on all amounts awarded; and

O.  Award CSI such other and further relief as the Court deems just and proper.

Plaintiff hereby demands a trial by jury of all issues in this action so triable.

Respectfully submitted,

Dated: December 6, 2021

*s/ J. Mark Wilson*
J. Mark Wilson
N.C. State Bar No. 25763
MOORE & VAN ALLEN PLLC
100 North Tryon Street, Suite 4700
Charlotte, North Carolina 28202
Telephone (704) 331-1000
Facsimile (704) 339-5981
Email: markwilson@mvalaw.com