# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:21-cv-00302-MOC-DSC

| | |
|---|---|
| **CONTROLS SOUTHEAST, INC.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**QMAX INDUSTRIES, INC. and THOMAS W. PERRY,**<br><br>**Defendants.** | **DEFENDANTS' BRIEF IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO RULES 12(B)(1) AND 12(B)(6)** |

This is a lawsuit between two North Carolina companies alleging the breach of a settlement agreement. The complaint asserts claims for breach of contract, fraud, civil conspiracy, and unfair and deceptive trade practices. Plaintiff attempts to anchor these state-law claims in federal court by contending that this alleged breach of the settlement agreement amounted to a violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"). Courts have repeatedly refused to utilize RICO as a basis to preempt state-law disputes. Because Plaintiffs' complaint describes no predicate acts, because an expired three-year settlement agreement cannot give rise to sufficient continuity, and because there is only one alleged victim of this supposed scheme, there can be no claim under RICO.

As a tacit recognition that the RICO claim cannot survive even preliminary scrutiny, CSI amended its complaint following Defendants' initial motion to dismiss to assert two new federal claims in the apparent hope that they would alternatively serve as a jurisdictional hook for the state-law claims arising out of the settlement agreement. Those two claims—false designation of origin and false advertising (the "Lanham Act Claims")—allege that Defendant's website

displayed two erroneous product pictures and an outdated informational chart at a time after the settlement agreement expired. The Lanham Act Claims and the state law claims have no meaningful relationship with each other and do not share a common nucleus of operative fact. Thus, the Court cannot exercise supplemental jurisdiction over the state law claims, which must be dismissed for lack of subject matter jurisdiction.

## I. FACTUAL ALLEGATIONS

Plaintiff Controls Southeast, Inc. ("CSI") is a North Carolina corporation operating its principal place of business in Pineville, North Carolina. (ECF 14, Am. Compl. ¶ 6.) Defendant QMax Industries, Inc. ("QMax") is likewise a North Carolina corporation operating from North Carolina. (*Id.* ¶ 7.) Defendant Thomas W. Perry, a principal of QMax, is now a resident of Pennsylvania. (*Id.* ¶ 8.)

In 2016, CSI sued QMax on a number of grounds. (*Id.* ¶¶ 1-2.) One of the grounds omitted from CSI's recitation, but that was the source of federal jurisdiction in that case, was CSI's claims for declaratory relief concerning several federal patents. *See* 3:16-cv-00230-FDW-DSC *Dkt.* 1 ¶ 1. The parties resolved the 2016 litigation by a settlement agreement on August 29, 2018. (Am. Compl. ¶ 3 & Ex. A, the "Settlement Agreement".) The Settlement Agreement further stated that any action to enforce patent rights assigned in the Settlement Agreement would be first addressed by informal, and then formal, mediation attempts. (Settlement Agreement § 9.1.)

Of most prominence in CSI's claims, the Settlement Agreement contained a provision in which QMax and Perry agreed that they would not sell products into the "Sulphur Field," as defined by the Settlement Agreement, for three years. (Am. Compl. ¶¶ 13, 34.) QMax and Perry

- 2 -

also agreed to provide an annual attestation to CSI of their compliance with this provision. (*Id.* ¶ 15.)

The Settlement Agreement's no-Sulphur-sales-provision contained an express exception for four contracts in place before the parties executed the agreement. (*Id.* ¶ 21.) CSI claims that the information about the four contracts, listed in the Settlement Agreement by date, buyer, location and amount, was false. (*Id.* ¶¶ 22-31.) The Amended Complaint alleges that, as a result, statements made by Perry about his compliance with the Settlement Agreement were false—in total three declarations regarding QMax's lack of sales in the Sulphur industry from November 2019 to November 2020, (*Id.* ¶ 143), two emails to CSI's attorney from December 2020 and January 2021, (*Id.* ¶¶ 144-45), and email to an auditor working on CSI's behalf from June 2021. (*Id.* ¶ 146.) CSI also contends that Perry made an additional false representation that the four contracts existed before the effective date of the Settlement Agreement, but CSI does not state when this communication occurred or the method by which Perry used to convey this information. (*Id.* ¶ 142.)

CSI contends that QMax and Perry violated the no-Sulphur-sales-provision in two other ways. First, CSI alleges that QMax supplied an unspecified amount of product in response to a scope of work document issued on January 22, 2020 for a project at a Shell refinery in Deer Park, Texas. (*Id.* ¶¶ 48-56.) CSI finally contends that QMax and Perry, "[o]n information and belief," working through a distributor, sold an unspecified amount of product for a Sulphur application in April or May 2021. (*Id.* ¶¶ 57-60.) CSI claims that, after it confronted QMax and Perry about these two projects, Perry made false claims about the source of the products and secretly concealed his and QMax's intention to breach the Settlement Agreement. (*Id.* ¶¶ 77-83.)

In the most conclusory of terms, CSI claims that it "relied on Defendants' representations" that they "had not sold products into the Sulphur Field during the Exclusionary Period." (*Id.* ¶ 85.) The Amended Complaint provides no factual detail whatsoever regarding what actions CSI took, or could have taken, in reliance on these representations—after all, CSI has filed a lawsuit claiming that it does not believe QMax and Perry's representations to be true.

Indeed, the Amended Complaint instead admits, just a few paragraphs later, that CSI did not rely on QMax and Perry's representations. Instead, CSI invoked its rights under the audit provisions of the Settlement Agreement and hired a third-party auditor to audit QMax's books and records. (*Id.* ¶¶ 87-88.) Dissatisfied with the results of the audit (which in no way corroborate the allegations of this lawsuit) CSI filed the instant lawsuit in federal court. The lawsuit asserts claims under RICO and the Lanham Act as well as claims under North Carolina law for breach of contract, fraud, civil conspiracy, and unfair and deceptive trade practices (the "State Law Claims"). (*Id.* ¶¶ 112-188.)

Defendants initially moved to dismiss, arguing as they do here, that the RICO claim should be dismissed because there is no cognizable claim for racketeering on these facts and that the State Law Claims should be dismissed for lack of subject-matter jurisdiction as a result. (ECF 11.) In response, CSI filed the Amended Complaint, adding the Lanham Act Claims and several factual allegations primarily relating to the Lanham Act Claims. (ECF 14.)

CSI's Amended Complaint describes the facts relating to the Lanham Act Claims in paragraphs 99-111, which focus exclusively on two product pictures CSI claims were on QMax's website in December 2021 (Am. Compl. ¶ 100) and one summary chart CSI claims is outdated. (*Id.* ¶ 109.) The Amended Complaint claims solely based "on information and belief" that customers have been confused by these images, even though QMax does not sell products over

its website and the pictures referenced linked to correct depictions of QMax's products.  Rather than prepare to defend its original RICO claim from dismissal on the merits, CSI spent its time mining QMax's website for pictures it could claim were confusing and thus constituted false advertising under federal law.  These claims have no relationship, however, to the state-law claims on which this lawsuit is centered.

## II. ARGUMENT

Breaching a private settlement agreement does not make one a racketeer, and the facts alleged in CSI's Complaint make it clear that the claims in this case *cannot* give rise to a claim for violation of RICO.  The inclusion of this claim is a transparent attempt to shoehorn a state-law dispute between non-diverse parties into federal court where it does not belong.  Because CSI's Complaint fails to state a RICO claim, this Court lacks subject matter jurisdiction over the State Law Claims which are related to it.  Nor do the Lanham Act Claims, added by amendment in the vain hope of holding the case in this Court, provide a basis for exercising supplemental jurisdiction over the State Law Claims because they do not arise from a common nucleus of operative fact.

### A. *CSI's RICO Claim Fails Because It is Not Within the Intended Purview of RICO and CSI Failed to Plead Predicate Acts, Continuity in Such Predicate Acts, or that Defendants Engaged in a Pattern of Racketeering Activity.*

1. RICO is Not a Tool to Convert Federal Courts into Forums for State-Law Claims.

CSI's principal contention in its Amended Complaint is that QMax and Perry breached the Settlement Agreement with CSI.  (Am. Compl. ¶¶ 3-4, 9, 13-98.)  In fact, the term "Settlement Agreement" appears *98 times* in CSI's Amended Complaint.  Congress's primary intent in passing RICO, however, was to use it to combat the proliferation of organized crime, especially the "predations of mobsters"—not as a cudgel in the prosecution of claims arising out of private contracts.  *See  H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 245, 109 S.Ct. 2893, 2904

- 5 -

(1989); s*ee Russello v. U.S.*, 464 U.S. 16, 25, 104 S.Ct. 296, 302 (1983) (stating that RICO was passed with the intent to use it "in a broad assault on organized crime."); *U.S. v. Turkette*, 452 U.S. 576, 591, 101 S.Ct. 2524, 2532 (1981) ("[T]he legislative history [of RICO] forcefully supports the view that the major purpose of [RICO] is to address the infiltration of legitimate business by organized crime."). When faced with a RICO claim, courts must "ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted." *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quoting *Menasco, Inc. v. Wasserman,* 886 F.2d 681, 683 (4th Cir. 1989)).

Courts within the Fourth Circuit have a long history of dismissing civil RICO claims where the conduct described is not subject to regulation by RICO. *Menasco, Inc*, 886 F.2d at 685 (affirming dismissal the plaintiff's RICO claim because "if we were to recognize a RICO claim based on the narrow fraud alleged here, the pattern requirement would be rendered meaningless."); *GE Inv. Priv. Placement Partners II v. Parker*, 247 F.3d 543 (4th Cir. 2001) (affirming dismissal of the plaintiff's RICO claim for failure to allege conduct that posed a special threat to social-well-being.); *Sealy v. U.S. Bank Nat'l Ass'n.*, No. 3:20-CV-431, 2021 WL 1178063 at *3 (W.D.N.C. Mar. 29, 2021) (dismissing the plaintiff's RICO claim because "these particular wire fraud counts would collectively constitute one interaction with the Plaintiffs rather than . . . a larger pattern."). This is not a matter of formalistic pleading standards but instead a straightforward review of whether the exercise of federal jurisdiction is appropriate over claims that derive from matters regulated principally by state law. *See, e.g.*, *US Airline Pilots Ass'n*, 615 F.3d 312 (affirming dismissal of RICO claim for failure to state a claim and

lack of subject-matter jurisdiction). Here, the defect of CSI's Amended Complaint is not merely that it has stated an implausible claim for violation of RICO, but that it has affirmatively described facts establishing, on multiple grounds, that no RICO claim can exist.

### 2. CSI's Amended Complaint Identifies No Predicate Act That Could Serve as the Basis of a RICO Claim.

A RICO claim can arise only from allegations that the defendants engaged in, or conspired to engage in, a pattern of racketeering activity. 18 U.S.C. § 1962; *US Airline Pilots Ass'n*, 615 F.3d at 317. The statute defines "racketeering activity" to include a number of predicate acts—relevant here are only mail and wire fraud. 18 U.S.C. § 1961(1)(B). When a RICO plaintiff fails to allege the elements of at least two predicate acts, the claim must be dismissed. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 235 (4th Cir. 2004) (affirming dismissal of a RICO claim because the plaintiff failed to properly allege the elements of mail or wire fraud). Here, CSI's claim fails to identify a justiciable federal claim under RICO because it does not actually allege, nor could it allege, predicate acts of mail and wire fraud arising out of the alleged breach of a settlement agreement.

At the outset, courts should be "cautious" about basing a RICO claim on predicate acts of mail and wire fraud because "it will be the unusual fraud that does not enlist the mails and wires in its service at least twice." *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000) (quoting *Anderson v. Found. for Advancement, Educ. & Emp. of Am. Indians,* 155 F.3d 500, 506 (4th Cir.1998)). "This caution is designed to preserve a distinction between ordinary or garden-variety fraud claims better prosecuted under state law and cases involving a more serious scope of activity." *Id.* (citing *Anderson,* 155 F.3d at 506).

CSI's RICO claim first fails to identify a predicate act because the alleged mail or wire "fraud" did not deprive CSI or anyone else of anything of value, as required by the relevant

statute.  The commission of criminal mail or wire fraud requires that the defendant (1) devised or intended to devise a scheme to defraud and (2) used mail or wire communications in furtherance of the scheme.  *U.S. v. Wynn*, 684 F.3d 473, 477-478 (4th Cir. 2012) (citing *U.S. v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012).  As used in the mail and wire fraud statue, the element "to defraud" has "the common understanding of *wronging one in his property rights* by dishonest methods or schemes and usually signif[ies] the deprivation of something of value by trick, deceit, chicane, or overreaching."  *Wynn*, 684 F.3d at 477-78 (quoting *Carpenter v. U.S.*, 484 U.S. 19, 27, 108 S.Ct. 316, 321 (1987)) (emphasis added).  Thus, for there to be mail or wire fraud, it is essential that the victim actually had an interest in money or property obtained by the defendant.  *U.S. v. Gillion*, 704 F.3d 284, 295 (4th Cir. 2012).

Even accepting as true the dubious assertion that Perry's seven statements were sent in furtherance of a purported scheme or were even false, there could be no mail and wire fraud because no one, CSI included, was deprived of any money or property.  There is not a single allegation—nor could there be—that Perry obtained anything from CSI by tendering his periodic affirmations of compliance with the Settlement Agreement.  In fact, those affirmations were ultimately fruitless—CSI audited QMax and then sued both QMax and Perry notwithstanding the allegedly fraudulent affirmations.  (Am. Compl. ¶ 88.)

Finally, CSI's conclusory assertions of detrimental reliance cannot support any kind of fraud claim.  A plaintiff alleging a RICO violation based on mail or wire fraud must allege that it detrimentally relied on the fraudulent communications and that the communications were a proximate cause of an injury.  *Am. Chiropractic Ass'n*, 367 F.3d at 233; *Chisold v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir. 1996).  Claims for fraud must be pled subject to Federal Rule of Civil Procedure 9(b), which requires that the claimant plead fraud with specificity.

- 8 -

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). A RICO claim that asserts mere "conclusory allegations" fails to satisfy the particularity requirement under Rule 9(b) and must be dismissed. *Menasco, Inc.,* 886 F.2d at 684.

Here, CSI asserts mere conclusory allegations about reliance. CSI's allegations related to reliance are limited to the following:

> 85.     CSI relied on Defendants' representations, several of which were made under oath in sworn declarations, that Defendants and their distributors and representatives had not sold products in to the Sulphur Field during the Exclusionary Period.

(Am. Compl. ¶ 85.) At no point does CSI describe what actions it took in reliance on the communications or when it took such actions. Rather than relying on these communications, CSI invoked its audit rights. (Am. Compl. ¶ 88.) These allegations cannot support a claim for mail or wire fraud and cannot convert this dispute about the Settlement Agreement into one governed by federal racketeering law. *See Chubirko v. Better Bus. Bureau of S. Piedmont, Inc.*, 763 F. Supp. 2d. 759, 766-67 (W.D.N.C. 2011) (dismissing a RICO claim based on mail and wire fraud for failure to plead the circumstances of the mail and wire fraud with particularity).

Ultimately, CSI's Complaint boils down to the assertion that QMax and Perry lied to it about their compliance with the Settlement Agreement. There is serious doubt about whether this even states a claim for fraud under state law. But it does not constitute any form of mail or wire fraud that could serve as a predicate act for a RICO claim. If the bald allegation that a party had lied about its compliance with a contract could unlock the gates to federal court for such a state-law dispute, federal courts would be mired in breach of contract cases masquerading as RICO claims just like this one. Courts have consistently refused to allow the misuse of RICO in this way.

3.  <u>A RICO Claim Requires Continuity of Misconduct; A Now Expired Three-Year
Settlement Agreement Can Provide No Such Opportunity for Continuity.</u>

A RICO claim requires not merely predicate acts, but their "continuity plus relationship,"
meaning that the predicate acts are related and that they amount to or pose a threat of continued
*criminal activity. H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. at 2900. A plaintiff must allege a "pattern
of racketeering activity" to state a claim under RICO. *Id.* at 237, 109 S.Ct. at 2899. The purpose
of the pattern requirement is to prevent ordinary, state law commercial fraud cases from being
transformed into federal RICO claims. *See Menasco, Inc.*, 886 F.2d at 685 ("If the pattern
requirement has any force whatsoever, it is to prevent this type of ordinary commercial fraud
from being transformed into a federal RICO claim"); *Flip Mortg. Corp. v. McElhone*, 841 F.2d
531, 538 (4th Cir. 1988) ("[T]his circuit will not lightly permit ordinary business contract or
fraud disputes to be transformed into federal RICO claims."). The continuity element arises
from Congress' concern with long-term criminal conduct, and as such, it demonstrates Congress'
desire to limit RICO's application to "ongoing unlawful activities whose scope and persistence
pose a special threat to social well-being." *Menasco,* 886 F.2d at 684 (quoting *Int'l Data Bank,
Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir.1987)). CSI's Amended Complaint reveals the
impossibility of such a pattern.

There are two types of continuity in RICO cases—open-ended and closed-ended. *H.J.
Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902. CSI cannot demonstrate either type. A plaintiff cannot
demonstrate open-ended continuity if the racketeering activity has a built-in ending point
because there is no threat that the racketeering activity will extend into the future. *Parker,* 247
F.3d at 549; *US Airline Pilots Ass'n,* 615 F.3d at 318.

In *Parker*, the defendants engaged in a series of mail and wire frauds to inflate artificially
the value of their company before its initial public offering. *Parker*, 247 F.3d at 546. The

plaintiffs, who were investors in the company, alleged that these acts of mail and wire fraud served as predicate acts to a RICO violation. *Id.* at 548. Affirming dismissal, the Fourth Circuit held that the scheme did not have sufficient continuity. *Id.* at 549. The court reasoned that the seventeen-month period of fraudulent conduct was insufficient to allege closed-ended continuity and that open-ended continuity was not present because the initial public offering served as a built-in ending point to the fraudulent conduct. *Id.*

The same is true here. The scheme alleged by CSI has a built-in ending point that has already passed—the end to the exclusionary period on August 29, 2021. (Am. Compl. ¶ 13.) Because there is no threat that the alleged fraudulent conduct can continue into the future, there is no open-ended continuity.

Nor could this dispute over settlement-agreement compliance implicate closed-ended continuity. When the alleged criminal activity at issue has ended, the requisite continuity exists only when the activity had extended over a substantial period. *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. at 2902; *Walk v. Baltimore and Ohio R.R.*, 890 F.2d 688, 689-90 (4th Cir. 1989).

The inquiry into closed-ended continuity addresses Congress' expressed intent of providing a remedy for long-term criminal conduct. *Walk*, 890 F.2d at 689-90. Cases involving racketeering activities over the course six or more years present close questions of closed-ended continuity. *See id.* at 690 (finding that a case involving "many" racketeering activities over the course of ten years was a close call); *H.J. Inc.*, 492 U.S. at 250, 109 S.Ct. at 2906 (finding that "numerous" racketeering acts over an "at least 6-year period" made it such that the petitioners might be able to prove closed-ended continuity). By contrast, the Fourth Circuit has affirmed the dismissal of a complaint alleging a single scheme over the course of four years, involving fifteen

separate investments, three victims, and only monetary loss. *See Myers v. Finkle,* 758 F. Supp. 1102, 1113 (E.D. Va. 1990) *aff'd in part and rev'd in part,* 950 F.2d 165, 169 (4th Cir. 1991).

Here, CSI's Amended Complaint in no way depicts of long-term criminal conduct. CSI claims to have stated seven different predicate acts of mail or wire fraud. (Am. Compl. ¶ 148.) Yet, one of those seven not only does not specify how Perry sent one of these purportedly fraudulent communications, it does not even specify when Perry sent it. (Am. Compl. ¶ 142.) Thus, at its most charitable construction, CSI has alleged six predicate acts spanning November 2019 to June 2021. (Am. Compl. ¶¶ 143-148.) Even assuming that the submission of these six communications over the course of twenty months could amount to fraud, it cannot be long-term *criminal conduct*.[1] This is a fraction of the period found to be insufficient to allege closed-ended continuity in *Myers*, with fewer racketeering acts and comparable to the seventeen-month period found to be insufficient in *Parker*. By contrast, the schemes that were close calls or permitted a finding of closed-ended continuity in *H.J. Inc.* and *Walk* included several predicate acts and took place over the course of six and ten years. Here, six communications (none of which actually meet the definition of mail or wire fraud) over the course of twenty months do not amount to long-term criminal conduct. A short-lived, infrequent scheme of alleged misrepresentations cannot have the closed-ended continuity of a criminal enterprise subject to RICO.

Ultimately, CSI's claims concern the supposed breach of the Settlement Agreement. This cannot involve the type of long-term criminal conduct that RICO was enacted to police. Because

---

[1] Decisions on the issue of continuity consistently refer to "criminal conduct" in determining whether a pattern of racketeering activity could take place. Defendants use this term in their brief as it is used in the decisions but note again that what is in dispute in this case is not "criminal" in any common or technical sense of the term. CSI claims that Defendants breached the settlement agreement and then lied to them about it. This is a quintessential civil dispute, not a criminal one.

CSI's claims are fundamentally claims arising under state law, they should be litigated in state court.

### 4. A Supposed Scheme with One Victim—the Counterparty to a Settlement Agreement—Lacks the Scope of a "Pattern of Racketeering Activity."

To qualify as a "pattern of racketeering activity" under the RICO statute, a scheme need not only have sufficient continuity but also a sufficiently wide scope. Narrow schemes, targeting few victims and involving few fraudulent acts are not within the purview of RICO because there is not a distinct threat of long-term criminal activity. *Menasco, Inc.*, 886 F.2d at 684 (quoting *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. at 2902). When a RICO claim is based on "a single, non-recurring scheme to defraud a single entity by taking unfair competitive advantage in a quite narrow business context," the pattern requirement is not met. *E. Pub. & Advert. Inc. v. Chesapeake Pub. & Advert.*, 895 F.2d 971, 972 (4th Cir. 1990). Accordingly, narrowly focused schemes with limited threat to the social well-being do not satisfy the pattern requirement. *Al-Abood*, 217 F.3d at 238.

Requiring a broad scope of supposedly fraudulent activity by the defendant in a RICO claim avoids transforming every allegedly dishonest business practice into a cause of action under RICO. *See Flip Mortg. Corp.*, 841 F.2d at 538. In *Flip Mortgage*, a creditor of a computer services corporation brought a RICO action against the directors of the corporation for unpaid debts, alleging that for seven years, the company repeatedly and intentionally underreported its revenue that it was contractually obligated to share with the creditor. *Id.* at 533. Even though the creditor was deprived of money properly due to it on several occasions over a long period of time, its pleadings presented this series of events as part of a single scheme perpetrated by the defendants against a single victim. *Id.* at 538. The creditor even alleged that the defendants "never intended to abide by the contract's terms." *Id.* Yet because of "the unity

and narrow focus of the scheme" the Fourth Circuit affirmed judgment in the defendants' favor. *Id.* Observing that the Fourth Circuit "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims," the court reasoned that there was no pattern of racketeering activities and the dispute was best left to state law. *Id.*

Likewise in *Al-Abood*, the plaintiff filed a RICO action against former family friends, alleging that money that the plaintiff gave to the defendants for investment purposes was instead used for the defendants' own financial gain. *Al-Abood*, 217 F.3d at 230. In doing so, the defendants had made use of the mail and wires in furtherance of three discrete schemes over the course of several years. *Id.* at 238. Yet the Fourth Circuit affirmed judgment as a matter of law in favor of the defendants, reasoning that "the narrow focus of the scheme here—essentially a dispute between formerly close family friends—combined with the commonplace predicate acts [mail and wire fraud]" did not satisfy the pattern requirement, particularly where "there was only one victim of the fraud." *Id.*

Here, CSI's attempts to convert a supposed single-victim scheme arising out of the alleged breach of a settlement agreement into a RICO claim merit the same analysis and same end as those in *Flip Mortgage* and *Al-Abood*. These allegations do not warrant RICO treatment because they do not exceed what exists in customary fraud cases. Similar to the defendants in *Flip Mortgage* and *Al-Abood*, this case involves alleged mail or wire fraud directed to only one victim. Further, there is only one alleged scheme over the course of twenty months here, whereas there were three schemes in *Al-Abood* that took place over several years. The predicate acts alleged by CSI are the exact type of ordinary, garden-variety fraud that courts should avoid when faced with RICO claims. This is an ordinary, garden-variety business dispute whose determination has no implications outside the individual parties to this lawsuit. Holding that

- 14 -

such allegations are sufficient to state a RICO claim would "threaten the ordinary run of commercial transactions," permit treble damage suits to be "brought against isolated offenders for their harassment and settlement value," and eclipse "multiple state and federal laws bearing on transactions." *See US Airline Pilots Ass'n,* 615 F.3d at 317.

Here, the Amended Complaint precludes any conclusion that Perry engaged in a pattern of racketeering activity because of the narrow scheme described. CSI is both Plaintiff and sole alleged victim of Perry's breach of the Settlement Agreement. No amount of colorful description can transform this garden-variety business dispute into the type of criminal behavior contemplated by RICO. As such, CSI's RICO claim must be dismissed.

### B. The Court Cannot Exercise Supplemental Jurisdiction Over the State Law Claims Because They Do Not Share a Common Nucleus of Operative Fact with the Lanham Act Claims

Newly added to its Amended Complaint, CSI asserted the Lanham Act Claims after an apparent sweeping review of the QMax website. The factual allegations for these claims are appended to the factual allegations concerning the RICO and state-law claims and relate to pictures that were briefly displayed on QMax's website and available in December 2021. Because these claims are distinct and do not share a common nucleus of operative fact, the State Law Claims must be dismissed for lack of subject-matter jurisdiction.

Federal courts are courts of limited jurisdiction, and may only hear and decide cases when permitted by the Constitution or by federal statute. *In re Bulldog Trucking, Inc.,* 147 F.3d 347, 352 (4th Cir. 1998). Federal courts have original subject-matter jurisdiction if there is federal question jurisdiction under 28 U.S.C. § 1331 or diversity of citizenship under 28 U.S.C. § 1332. When a federal court has original jurisdiction, it has supplemental jurisdiction over other claims that are so related to those with original jurisdiction that they form part of the same case or controversy, meaning they share a common nucleus of operative fact such that the plaintiff

- 15 -

would ordinarily be expected to try them together. 28 U.S.C. § 1367(a); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130 (1966); *Bradley v. N. Carolina Dep't of Transp., Div. of Motor Vehicles*, 286 F. Supp. 2d 697, 704 (W.D.N.C. 2003).

Here, the Lanham Act Claims and the State Law Claims are not part of the same case or controversy because they do not share a common nucleus of operative fact. As if to illustrate the point, when CSI first filed this lawsuit it did not include the Lanham Act Claims or the distinct factual allegations supporting those claims as part of its original complaint. Instead, in order to support its new Lanham Act Claims, CSI added at least 12 paragraphs of new factual allegations that relate solely to the Lanham Act Claims. The manner in which CSI added the Lanham Act Claims to this case reveals that they are factually distinct from the State Law Claims.

An examination of the operative facts supporting both sets of claims confirms that they are not a part of a common nucleus. Specifically, the Lanham Act Claims are based on two pictures from QMax's website that CSI claims improperly display the former "channel over tube" design, over which CSI now claims ownership (Am. Compl. ¶ 100 and p. 17) and a separate chart CSI speculates contains outdated data. (*Id*. ¶ 109.) Thus, the dispute over the Lanham Act Claims would focus on the accuracy of these two pictures and one chart, whether customers were confused by them (*id*. ¶¶ 117-19, 126-28), and whether CSI actually suffered any lost sales and damages as a result. (*Id.* ¶ 111.) Conversely, the dispute over the State Law Claims would focus on communications between the CSI and the Defendants, the nature of QMax's sales, and the obligations owed by Defendants to CSI during the exclusionary period of August 2018 to August 2021. There is nothing in common between these sets of operative facts beyond the identities of the parties and the fact that they settled a dispute amongst themselves in August 2018.

For the Court to exercise subject-matter jurisdiction over CSI's State Law Claims, they must be a part of the same case or controversy as a claim over which the Court has original jurisdiction. Initially, CSI attempted to use the RICO claim as the basis to litigate the State Law Claims in federal court. When it became clear that the RICO claim was unlikely to serve that purpose, CSI haphazardly amended its complaint to add the Lanham Act Claims based on three images from a website from which QMax does not *even conduct online sales*.[2] Though the frivolity of the Lanham Act Claims will be evident another day, what CSI has ignored is that state law claims must share factual overlap with federal claims in order to enable the exercise of supplemental jurisdiction over them. Even a cursory examination of the Lanham Act Claims and the State Law Claims here show that the operative facts are completely different. Thus, the State Law Claims should be dismissed.

## IV. CONCLUSION

CSI's RICO claim is precisely the type of claim that the Fourth Circuit has stated is outside of RICO's intended coverage. The Amended Complaint's allegations foreclose applying RICO to this breach-of-contract dispute. The conduct alleged by CSI here does not and cannot rise to the level of "long-term, habitual criminal activity" governed by RICO. Rather, the Court should dismiss the RICO claim with prejudice because the conduct of which CSI complains is an ordinary contract dispute controlled by state law and appropriately litigated in state court.

Further, the Lanham Act Claims asserted by CSI do not create supplemental subject-matter jurisdiction such that the Court can decide those issues of state law. The Lanham Act

---

[2] CSI's Lanham Act claims were undoubtedly asserted without any factual investigation into whether any customer was misled or whether CSI suffered any actual injury. They are without merit. Nevertheless, QMax removed the allegedly offending images from its website—which had only been posted for a few months—immediately after CSI's filing of the Amended Complaint. Defendants are confident that CSI will withdraw its Lanham Act claims when the Court dismisses the RICO and State Law claims, as their only purpose here derives from the mistaken belief that they can serve to anchor jurisdiction over the State Law claims.

Claims and the State Law Claims raise distinct factual questions.  As a result, CSI's belated attempt to keep this entire dispute in federal court should fail and the State Law Claims of fraud, civil conspiracy, breach of contract, and unfair and deceptive trade practices should be dismissed without prejudice so that they can be litigated in the appropriate forum.

This 8th day of April, 2022.

/s/ Brian L. Church
Brian L. Church
N.C. Bar No. 39581
BChurch@robinsonbradshaw.com
Timothy P. Misner
N.C. State Bar No. 56364
tmisner@robinsonbradshaw.com

**ROBINSON, BRADSHAW & HINSON, P.A.**
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina 28246
Telephone:     704.377.2536
Facsimile:     704.378.4000

*Counsel for Defendants*