# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:21-cv-00302-MOC-DSC

| | |
|---|---|
| **CONTROLS SOUTHEAST, INC.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**QMAX INDUSTRIES, INC. and THOMAS W. PERRY,**<br><br>**Defendants.** | **DEFENDANTS' REPLY BRIEF IN SUPPORT OF ITS PARTIAL MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT PURSUANT TO RULES 12(B)(1) AND 12(B)(6)** |

In opposition to Defendants' Motion to Dismiss, Plaintiff Controls Southeast, Inc. ("CSI") makes two primary arguments. First, CSI argues that this Court can exercise supplemental jurisdiction over CSI's claims for breach of contract, fraud, civil conspiracy, and unfair and deceptive trade practice (the "State Law Claims") because they have a "loose factual connection" to CSI's claims for false designation of origin and false advertising ("the Lanham Act Claims")—claims which it appended to the Amended Complaint only in response to Defendants' initial motion to dismiss. Second, CSI argues that its claim under the Racketeering Influence and Corrupt Organizations Act ("RICO") should survive because there are no per se rules barring RICO claims of the small scale and scope it has alleged.

CSI advances both arguments based largely on inapposite citations to unpublished or non-binding decisions from lower courts outside of this jurisdiction. Accepting CSI's arguments would require this Court to essentially re-write the law on supplemental jurisdiction and applicable RICO standards. By contrast, Defendants' brief in support of the motion to dismiss (ECF 20) is entirely supported by applicable and often binding case law from the Supreme Court,

the Fourth Circuit, and the Western District of North Carolina. Despite Defendants' citation to at least 15 directly relevant Fourth Circuit cases addressing the RICO claim and issues of supplemental jurisdiction that compel dismissal, CSI's brief engages none of them.

Here, CSI has pleaded too narrow of a scheme to avoid dismissal of its RICO claim. Further, because CSI misstates the applicable standard as set out by the Supreme Court and applied by the Fourth Circuit for the exercise of supplemental jurisdiction, its efforts to stave off dismissal of the State Law Claims must too fail.

## I. ARGUMENT

CSI's Amended Complaint focuses on the purported breach of the no-Sulphur-sales-provision—on which it bases its RICO claim—and the first 91 substantive paragraphs, and 149 of 181 in all, of its Amended Complaint center on these allegations. (Am. Compl. ¶¶ 1-5, 13-98, 131-88, ECF 14.) In those paragraphs, CSI alleges that QMax and its principal Perry breached the parties' settlement agreement and sold heat transfer products into the Sulphur industry. This wrong, they say, amounts not only to breach of contract and fraud, among other state law claims, but a violation of RICO. (Am. Compl. ¶¶ 131-88.)

Notwithstanding the clear predominance of these allegations in the Amended Complaint, CSI makes a tacit admission that the RICO claim directly arising from these facts is not the best argument for federal jurisdiction over the State Law Claims by burying it behind its argument that the Court base supplemental jurisdiction on its Lanham Act Claims. (Opp. Br. at 11.) Yet the propriety of federal jurisdiction should rise or fall with the adequacy of the RICO claim, which Defendants will address in their reply first. CSI's allegations cannot sustain a RICO claim because they cannot establish a predicate act or that a pattern of racketeering activity occurred within the meaning of the statute. Because the RICO claim must be dismissed, it cannot serve as

the basis for this Court's exercise of supplemental jurisdiction over the State Law Claims. That leaves only CSI's argument that the Lanham Act Claims should serve as the basis for this Court's jurisdiction over the entirety of the lawsuit.

Further, despite CSI's eleventh-hour attempt to keep the State Law Claims into federal court by appending the Lanham Act Claims to the Amended Complaint, its efforts fail because the Lanham Act Claims are separately determinable and maintainable without *any* reference to the State Law Claims. As a result, this Court should dismiss the RICO claims for failure to state a claim and dismiss the State Law Claims for lack of subject matter jurisdiction.

### A. CSI's RICO Claim Still Fails Because of Plaintiff's Failure to Plead Either Predicate Acts or a Pattern of Racketeering

This breach-of-contract case amounts to a RICO claim, CSI says, because Perry wrongly affirmed his compliance with the Settlement Agreement by mail or the internet about six times in a period of less than three years. (Am. Compl. ¶¶ 143-47.) In opposing dismissal of the RICO claim, CSI feebly asserts that it pleaded both predicate acts and a pattern of racketeering activity. (Opp. Br. pp. 11-18.) Neither is accurate. Rather, despite CSI's contention, it pleaded ordinary, garden-variety breach of contract and fraud claims that fail to identify any concrete property interest in the money Defendants supposedly obtained at their expense. CSI's allegations foreclose a finding of any pattern of racketeering activity because the totality of the circumstances shows an alleged narrow, infrequent, single, and targeted scheme of the same kind that the Fourth Circuit has repeatedly affirmed dismissal.

### 1. CSI's Amended Complaint Identifies No Predicate Act That Could Serve as the Basis of a RICO Claim.

When a RICO plaintiff fails to allege the elements of at least two predicate acts, the claim must be dismissed. *See Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.,* 367 F.3d 212, 235 (4th Cir. 2004). CSI argues the following in support of the notion that it pleaded predicate acts:

1) there is no per se rule against a RICO claim involving only mail and wire fraud; 2) the facts pleaded by CSI go beyond an ordinary, garden-variety fraud claim; 3) CSI had a valid interest in money that Defendants received from the contracts in the Settlement Agreement; and 4) there is no per se rule against RICO claims that are also based on the breach of a contract. (Opp. Br. pp. 12-14.) None of these arguments are sufficient to show the Court that predicate acts were pleaded here.

First, Defendants brought to the Court's attention to the extensive Fourth Circuit case law instructing courts to be cautious of RICO claims based on predicate acts of mail and wire fraud—they do not advocate a per se rule. *See, e.g., Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000); *Anderson v. Found. for Advancement, Educ. & Emp. of Am. Indians,* 155 F.3d 500, 506 (4th Cir.1998); *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 154-55 (4th Cir.1987); *Foster v. Wintergreen Real Estate Co.*, 363 Fed. Appx. 269, 274 (4th Cir. 2010). This caution exists because it will be the "unusual fraud that does not enlist the mails and wires in its service at least twice." *Zepkin*, 812 F.2d 154-55; *Al-Abood*, 217 F.3d at 238 (citing *Anderson*, 155 F.3d at 506). Thus, though there is not a "per se" rule against RICO claims based only on mail and wire fraud, the Fourth Circuit has made clear these claims should be reviewed closely, so as not to expand the reach of RICO to "ordinary or garden-variety fraud claims better prosecuted under state law." *Al-Abood*, 217 F.3d at 238. As explained in the paragraph immediately below, an ordinary, garden-variety fraud claim is exactly what is present here.

Second, despite CSI's assertions and citation to a single unpublished decision from District of Maryland (Opp. Br. 12 (citing *Capital Lighting & Supply, LLC v. Wirtz*, No. 17-3765, 2018 WL 3970469, at *5 (D. Md. Aug. 20, 2018)), CSI has not pleaded anything beyond an ordinary garden-variety fraud claim. CSI contends that Perry's fraud convinced CSI to enter into

the contract and that Perry made at least six fraudulent statements during the course of the contract to further this "scheme." (Opp. Br. p. 12.) However, Fourth Circuit case law demonstrates that such allegations of fraud are common and thus insufficient to sustain a RICO claim. *See GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 551 (4th Cir. 2001) (quoting *Al-Abood*, 217 F.3d at 238) (holding that the plaintiffs' allegations did not fall "sufficiently outside the heartland of fraud cases to warrant RICO treatment" where the defendants' continued fraud convinced the plaintiffs to enter into multiple contracts to invest in the defendants' business); *Foster*, 363 Fed. Appx. at 274 (quoting *HMK Corp v. Walsey*, 828 F.2d 1071, 1074 (4th Cir. 1987)) (holding that the plaintiffs had pleaded "quintessential state law claims" and "not a scheme whose scope and persistence set it above the routine" where defendants' fraud over the course of eight years convinced the plaintiffs to invest into real estate even though the fraud was perpetrated on "hundreds" of victims). This Court must heed the Fourth Circuit's instruction and dismiss the RICO claim here because the fraud alleged is comparable to the garden-variety fraud that was present in *Parker* and *Foster*.

Third, CSI cannot merely say that it had an interest in the money received by QMax and make it so. CSI appears to allege that it had a valid interest in the sales from the contracts in the Settlement Agreement because it "believed it would have been successful in obtaining new contracts with these customers." (Opp. Br. 13.) Such an argument demonstrates a fundamental misunderstanding of the legal standards for what constitutes a property interest. Rather than the victim's unilateral "belief," the question of whether a victim had a property interest is whether the victim had a right that could be assigned, traded, bought, or otherwise disposed of. *U.S. v. Gillion*, 704 F.3d 284, 295 (4th Cir. 2012). CSI had no right to assign, trade, buy, or dispose of money from sales it "believes" it would have made but for the customers being listed in the

Settlement Agreement.  In fact, one of the few cases CSI relies on in its brief in opposition forecloses its own argument on this point.  *See Borg v. Warren*, 545 F. Supp. 3d 291, 312 (E.D. Va. 2021) (citation omitted) ("A showing of injury under the RICO statute requires proof of concrete financial loss, and not mere injury to a valuable intangible property interest.").

Finally, Defendants do not advocate for the creation or application of a per se rule against RICO claims that involve a contract.  Instead, Defendants seek to highlight for this Court that it is legally unsound to take an ordinary breach of contract and call it a RICO claim in an effort to drum up extra damages or create federal jurisdiction.  Not only does that make sense on its face, but it is supported by an *abundance* of binding Fourth Circuit case law.  *See, e.g.*, *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quoting *Menasco, Inc v. Wasserman,* 886 F.2d 681, 683 (4th Cir. 1989)*)* ("[W]e must also exercise caution 'to ensure that RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions are not eclipsed or preempted.'"); *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988) ("[T]his circuit will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims.").

In sum, none of the arguments raised by CSI demonstrate that it pleaded predicate acts sufficient to sustain a RICO claim.  CSI merely observed that there is not a per se rule foreclosing its RICO claim—despite the Fourth Circuit's strong and consistent admonitions against claims just like that CSI pursues here.  It has nakedly asserted that its allegations go beyond garden-variety fraud, and tried to convince this Court that CSI's "belief" that it would make certain sales is sufficient to determine that CSI has a property interest in the money QMax

received from the sales to third parties.  None of these arguments change the fact that CSI failed to plead predicate acts sufficient to maintain a RICO claim.

2. The Totality of the Circumstances of CSI's RICO Claim Demonstrates that That No Pattern of Racketeering Could Have Occurred.

According to CSI's Amended Complaint and opposition brief, these half-dozen supposedly false affirmations of compliance with the Settlement Agreement, which somehow retroactively cost CSI the opportunity to compete for contracts it believes it could have obtained, were not merely wire fraud but a pattern of racketeering activity.  (Am. Compl. ¶¶ 148-49.) CSI's arguments as to the sufficiency of a single-victim, three-year scheme to violate RICO boil down to the following: 1) there is no per se rule stating that the two to three year scheme CSI alleges cannot have sufficient continuity to violate RICO; and 2) there is no per se rule requiring RICO schemes to involve only one victim.  (Opp. Br. 15-18.)  Neither of these arguments impedes dismissal of CSI's RICO claim.

Though CSI specifically notes "the Fourth Circuit's admonition to look at the totality of the circumstances in evaluating the pattern element," its arguments ignore this overarching rule. (Opp. Br. 17) (citing *Capital Lighting*, No. 17-3765, 2018 WL 3970469, at *8 (D. Md. Aug. 20, 2018)).  Rather than look at the totality of the circumstances—and the triviality of its allegations when viewed in light of the purpose of RICO—CSI proposes that the Court deconstruct each element, offering comparisons to time frames or number of victims in other decisions while ignoring the totality of the circumstances in those cases that distinguish them from this one.

Indeed, cases on which CSI relies, when considered in their totality, demonstrate that the supposed scheme about which CSI complains here falls far short of a RICO violation.  In *Treads USA, LLC v. Boyd LP I*, No. 1:08-cv-27, 2010 WL 2711266, at *8 (W.D. Va. May 4, 2010), the court declined to dismiss the RICO claim because of the combination of "allegations before the

court that the activity occurred for a minimum of more than two years [and] allegations that multiple entities, investors, and individuals were harmed." Likewise, in *Cooke & Moses, LLC v. QSS-Engineered Sys. Grp. LLC*, No. 1:06-cv-147, 2007 WL 2463288, at \*8 (N.D. W. Va. Aug. 28, 2007), the court declined to dismiss a RICO claim based on a nineteen month-period of conduct that involved two schemes with multiple victims and multiple defendants. And in *Venzor v. Gonzalez*, 936 F. Supp. 445, 451 (N.D. Ill. 1996), the court concluded that "the number and variety of the predicate acts involved in setting up the *three separate schemes*. . . and the number of spectators who allegedly paid to see fake fights, as well as [Plaintiff]'s damages as a promoter of the Chavez-Houck fight, weigh in favor of holding that closed-ended continuity has been adequately alleged." (emphasis added). Here, by contrast, the "scheme" about which CSI complains involves only one supposed victim. CSI has not cited a single case in which a court has found close-ended continuity during such a short window for a scheme that involves only one victim.

CSI's cases are not only of dubious relevance, they are non-binding, two of the three are unpublished, and they in no way preempt binding Fourth Circuit precedent that compel dismissal of the instant claim. *See Flip Mortg. Corp.*, 841 F.2d at 538 (holding that allegations of fraudulent acts spanning seven years were insufficient to sustain a RICO claim where the events were a part of a single scheme directed against a single victim); *Myers v. Finkle,* 758 F. Supp. 1102, 1113 (E.D. Va. 1990), *aff'd in part and rev'd in part,* 950 F.2d 165, 169 (4th Cir. 1991) (affirming the dismissal of a RICO claim alleging a single fraudulent scheme with respect to fifteen separate investments over the course of four years, involving three victims and only monetary loss).

Finally, though there is not an explicit per se rule barring RICO coverage for schemes involving only one victim, it is noteworthy that the only case CSI cited in support of its argument is non-binding, unpublished, and also easily distinguishable. In *Capital Lighting*, the court concluded that the plaintiff had pleaded a pattern of racketeering activity and highlighted the totality of the circumstances, including that "[d]efendants did not engage in a single scheme to defraud Plaintiff" but that the complaint alleged "a [five] years' long endeavor by *multiple individuals* and companies, using *multiple* schemes to infiltrate, corrupt, and profit from an otherwise *legitimate business*." 2018 WL 3970469, at \*9 (emphasis in the original). By comparison, here, CSI alleged that there was a single scheme by one individual over the course of at most three years. The totality of the circumstances of the single-victim scheme here instead aligns more closely with those from binding Fourth Circuit cases that found no pattern of racketeering. *See Al-Abood*, 217 F.3d at 238 (finding that a single scheme targeted at one victim that lasted several years had a "narrow focus" and thus the pattern requirement was not met); *Flip Mort. Corp.* 841 F.2d at 538 (finding that there was not a pattern of racketeering when the plaintiff pleaded a single scheme against a single victim over the course of seven years).

Accepting as true the allegations CSI has offered, the totality of the circumstances demonstrates that no pattern of racketeering activity could exist here. This was true with CSI's initial complaint, and it is still true now, no matter how much detail CSI adds about each of Perry's communications. The pattern requirement was created to ensure that "RICO's extraordinary remedy does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions such as this one are not

- 9 -

eclipsed or preempted." *Menasco,* 886 F.2d at 683. Should the Court permit the RICO claim to proceed past the motion to dismiss, that is precisely what would happen.

**B. *The Court Cannot Exercise Supplemental Jurisdiction Over the State Law Claims Because They Do Not Share a Common Nucleus of Operative Fact with the Lanham Act Claims***

Because the RICO claim must be dismissed, the only federal claims remaining that could arguably serve as the basis for supplemental federal jurisdiction are the Lanham Act Claims. Yet despite the presence of the Lanham Act Claims, this Court cannot exercise supplemental jurisdiction over the State Law Claims because the two sets of claims do not share a common nucleus of operative fact. CSI argues that policy considerations of judicial economy and efficiency should lead the Court to exercise jurisdiction and that the Court has the ability to do so because the Lanham Act Claims and State Law Claims share a "loose factual connection." (Opp. Br. pp. 21-22.) These arguments misstate governing law and do not establish that the Court has the authority t1o exercise supplemental jurisdiction in this case.

1. <u>Subject Matter Jurisdiction is a Threshold Question and Questions of Judicial Economy, Efficiency, and Comity Cannot Be Answered Without It.</u>

CSI emphasizes the judicial efficiency and convenience in this Court hearing both the State Law Claims and the Lanham Act Claims. However, federal courts are courts of *limited jurisdiction*, and may only hear and decide cases when permitted by the Constitution or federal statute. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552, 125 S.Ct. 2611 (2005); *In re Bulldog Trucking, Inc.,* 147 F.3d 347, 352 (4th Cir. 1998). Federal courts frequently observe that it is not their role to employ untethered notions of what might be good public policy in their jurisdictional analysis. *Badgerow v. Walters*, 142 S.Ct. 1310, 1321 (2022) (citing *Whitmore v. Arkansas*, 495 U.S. 149, 161, 110 S.Ct. 1717 (1990)). "Even the most formidable

policy arguments cannot overcome a clear statutory directive." *BP P.L.C. v. Mayor and City Council of Baltimore*, 141 S.Ct. 1532, 1542 (2021) (citation omitted).

The statutory directive here comes from 28 U.S.C. § 1367(a), which permits federal jurisdiction over state claims that "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Public policy considerations of judicial economy, fairness, convenience, and comity only come into play once a court has made the threshold determination that it has subject matter jurisdiction under § 1367. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130 (1966). In the context of supplemental jurisdiction, needless decisions of state law by federal courts should be avoided both as a matter of comity and to promote justice between the parties. *Reinhart v. City of Brevard*, 826 F.Supp.2d 887, 890 (W.D.N.C. 2011) (citing *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130). Accordingly, CSI's argument that this Court should consider the efficiencies of consolidating its claims in its jurisdictional analysis would lead the Court to error. Moreover, whether or not it would be efficient for CSI to litigate its dispute in one place, it would not be efficient *for this Court* to entertain a state-law dispute over which it lacks subject matter jurisdiction.

2. <u>The Lanham Act Claims and State Law Claims Do Not Share a Common Nucleus of Operative Fact Because They are Separately Maintainable and Determinable.</u>

CSI's argument for subject matter jurisdiction depends primarily on its advancement of a legal standard—"loose factual connection"—that it plucked from the dicta of a distant district court order (Opp. Br. 6) (citing *Bennett v. Fastenal Co.*, 184 F. Supp. 3d 304, 308 (W.D. Va. 2016)) that stands at odds with the text of the relevant statute and decades of interpretive case law from the Supreme Court, Fourth Circuit, and the Western District of North Carolina. Rather than expand supplemental jurisdiction through a "loose factual connection" standard, the

Supreme Court, the Fourth Circuit, and the Western District of North Carolina have all continued to apply the "common nucleus of operative fact" test—and have not described this test as the "low hurdle" for which CSI advocates. *See, e.g., DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 334-35, 126 S.Ct. 1854 (2006); *Shavitz v. Guilford Cty. Bd. of Educ.*, 100 Fed. Appx. 146, 150 (4th Cir. 2004) ("The *Gibbs* test does not require that the federal and state claims only have some facts in common; instead, *Gibbs* requires that the claims share a 'common nucleus of operative fact.'"); *Roldan v. Bland Landscaping Co., Inc.*, No. 3:20-cv-276, 2022 WL 304828 (W.D.N.C. Feb. 1, 2022). The Fourth Circuit has provided further guidance about what "common nucleus of operative fact" means, stating that claims do not share a common nucleus of operative fact when one count is "separately maintainable and determinable without any reference to the facts alleged or contentions stated in or with regard to the other count." *White v. Cty. of Newberry, S.C.*, 985 F.2d 168, 171 (4th Cir. 1993) (citing *Hales v. Winn-Dixie Stores, Inc.*, 500 F.2d 836, 848 n. 12 (4th Cir 1974)). While there is no doubt that CSI likely prefers the "loose factual connection" standard, this Court is bound to consider whether the claims share a common nucleus of operative fact and nothing less.

Despite CSI's assertions, the Lanham Act Claims are separately maintainable and determinable without any reference to the facts alleged in the State Law Claims. The chart below illustrates as much by listing out facts that will be used to maintain and determine each sets of claims along with the paragraphs from CSI's Amended Complaint that such facts are located in:

| State Law Claims | Lanham Act Claims |
|---|---|
| • The events giving rise to the formation of the Settlement Agreement and its no-Sulphur-sales-provision(¶¶ 1-3)<br><br>• The meaning of the no-Sulphur-sales-provision (¶¶ 13-20)<br><br>• The status of the contracts excepted from the no-Sulphur-sales provision at the time Perry disclosed them (¶¶ 22-28)<br><br>• Perry's communications about his compliance with the no-Sulphur-sales-provision (¶¶ 38-40, 67-72)<br><br>• The truthfulness of Perry's communications about the no-Sulphur-sales-provision (¶¶ 41-44)<br><br>• QMax's role in and sales to Sulphur projects in Deer Park, TX and Shreveport, LA (¶¶ 50-62)<br><br>• The likelihood that CSI would have made sales for Sulphur applications to the companies listed in the Settlement Agreement (¶¶ 65-66) | • Whether the two pictures on QMax's website show the tube-over-channel design for heat transfer product (¶ 100)<br><br>• QMax's other communications with potential customers about tube-over-channel design (¶¶ 105, 107)<br><br>• The data reflected in a single chart on QMax's website regarding efficacy of channel-over-tube design (¶ 109)<br><br>• Sales QMax made as a result of consumer confusion based on the two pictures and chart (¶ 110)<br><br>• The likelihood that CSI would have made those sales but for the two pictures and chart (¶ 111)<br><br>• The amount of consumer confusion caused by the two photos and chart (¶¶ 116-119) |

In fact, the entirety of the Lanham Act claims can be maintained and determined solely by reviewing paragraphs 99 to 130 of CSI's Amended Complaint, none of which were a part of the original complaint. *Compare* ECF 1 *with* ECF 14 pp. 16-22. Those paragraphs, which include all of the facts and allegations that are determinative to the Lanham Act Claims, are attached to this brief as **Exhibit A** in order to show that they stand entirely on their own and completely apart from the no-Sulphur-sales-provision allegations that form the basis of the State Law Claims.

These new paragraphs containing the Lanham Act Claims make no mention of the facts listed in the State Law Claims or any other evidence that will determine the outcome of the State

Law Claims.  Instead, these paragraphs focus on QMax's use of the pictures and a chart on its website following the end of the exclusionary period, QMax's communications with consumers, and potential confusion from consumers as a result.  The entirety of the Lanham Act Claims are stated in the paragraphs in Exhibit A, and no reference to the other paragraphs from the Amended Complaint is needed.  Thus, the Lanham Act Claims and State Law Claims do not share a common nucleus of operative fact.

In its brief in opposition, CSI cites to two non-binding cases in which courts exercised supplemental jurisdiction and asserts that those cases are factually similar to this case.  (Opp. Br. p. 9) (citing *Chattery Int'l, Inc. v. JoLida, Inc.*, No. WDQ-10-2236, 2011 WL 1230822 (D. Md. Mar. 28, 2011); *BLT Restaurant Grp. LLC v. Tourondel*, 855 F. Supp. 2d 4, 11-12 (S.D.N.Y. 2012)).  However, in *Chattery*, both the federal and state law claims required the court to interpret an agreement between the parties where ownership of a trademark was exchanged. 2011 WL 1230822, at *9.  Similarly, in *BLT Restaurant Grp.*, the court expected "the entire context of the parties' original relationship and the events leading to, and following, the breach [to] be offered in evidence even if the federal claim were the only one being litigated here."  855 F. Supp. 2d at 11.

Here, while intellectual property was transferred to CSI in the Settlement Agreement, nothing about the Lanham Act Claims requires an interpretation of that agreement.  QMax and Perry do not contest whether the intellectual property was transferred to CSI in the Settlement Agreement.  Further, adjudicating the Lanham Act Claims in no way will require considering evidence regarding the interpretation or application of the no-Sulphur-sales-provision in the Settlement Agreement, which forms the exclusive basis of the State Law claims against QMax and Perry.

CSI seeks to downplay the factual overlap needed between claims by asserting that the identities of the parties and the fact that they are parties to the Settlement Agreement is enough for this Court to exercise supplemental jurisdiction. (Opp. Br. p. 6.) Such an assertion not only misstates the governing law, it seeks to entirely erode the common nucleus of operative fact standard set by the Supreme Court and applied by the Fourth Circuit.

For example, in *Hales*, the plaintiffs sought to try a state breach of contract claim against their former employer in federal court by arguing that the breach of contract shared a common nucleus of operative fact with a federal claim against the employer for its failure to disclose statutorily required information about that contract. 500 F.2d at 838-39. Despite the fact that both claims involved the same parties and made reference to the same contract, the Fourth Circuit held that the claims were separately determinable and maintainable, and thus did not share a common nucleus of operative fact. *Id.* at 847. Similarly, state law claims for fraud relating to the sale of property do not share a common nucleus of operative fact with a federal claim seeking to hold the seller of the property liable for costs owed to the EPA for cleaning up that property. *Axel Johnson, Inc. v. Carroll Carolina Oil Co., Inc.*, 145 F.3d 660, 662 (4th Cir. 1998). Despite both claims' relation to the property, the Fourth Circuit held that the claims did not share a common nucleus of operative fact because the facts used to support each were separate and distinct. *Id.* at 662. Here, the Lanham Act Claims and the State Law Claims share no common facts beyond the identity of the parties and the existence of a contract between them. The facts in each of these claims are no more common than what was held to be insufficient in *Hales* and *Axel Johnson*.

Despite CSI's arguments, this Court is still one of *limited* jurisdiction. To consider the State Law Claims, they must share a common nucleus of operative fact with the Lanham Act

Claims, meaning one set of claims is not separately maintainable and determinable without the other. Here, the determination of the Lanham Act Claims will require consideration of only the allegations in Exhibit A, which focuses on pictures on QMax's website and the effect those pictures had during a finite period of time that does not even overlap with the period at issue for the State Law Claims. By contrast, adjudication of the State Law Claims will require consideration of all of the other allegations in the complaint, the meaning, application, and compliance with the no-Sulphur-sales-provision of the Settlement Agreement, and what Perry communicated to CSI about it from August 2018 to August 2021. The facts used to support these claims are separately determinable. Accordingly, there is no basis for asserting supplemental jurisdiction over the State Law claims and they must be dismissed.

3.   <u>Even Were a Common Nucleus of Operative Fact Apparent, this Court Should Dismiss the State Law Claims Because They Substantially Predominate Over the Lanham Act Claims.</u>

Even if grounds for exercising supplemental jurisdiction over the State Law claims existed based on their alleged connection to the Lanham Act claims, this Court can and should exercise its discretion under 28 U.S.C. § 1367(c)(2) to dismiss them anyway. It is beyond dispute that, of the 181 substantive paragraphs of the Amended Complaint, only 32 of them relate to the Lanham Act Claims. (Am. Compl. ¶¶ 99-131.) Of the 101 pages of allegations and exhibits filed with the Amended Complaint, only six relate to the Lanham Act claims. (Am. Compl. pp. 16-22.) A rudimentary analysis of the relative distribution of allegations shows that the State Law Claims—of which CSI has asserted four separate claims—vastly predominate over the Lanham Act Claims.

Courts assess predominance through "a consideration of the proof offered on the asserted claims, the scope of the issues raised, and the comprehensiveness of the remedy sought." *NouvEON Tech. Partners v. McClure*, No. 3:12–CV–633, 2013 WL 811102, at \*2 (W.D.N.C.

Mar. 5, 2013) (quoting *Gibbs*, 383 U.S. 715, 726-27). Claims substantially predominate where they are more important, more complex, more time consuming to resolve, or in some way more significant than its federal counterpart. *Id*. at \*2 (citation omitted). The purpose of the substantial predomination rule is to avoid federal interference with state enforcement schemes. *White*, 985 F.2d at 172.

Here, the State Law Claims substantially predominate the Lanham Act Claims. CSI, despite raising and anticipating the application of this exception to supplemental jurisdiction in its response, offers no argument against the obvious predominance of the State Law Claims over the Lanham Act Claims. It did not because it could not. Of the two sets of claims, the State Law Claims will require significantly more proof and time to resolve and raise a much wider scope of issues. The State Law Claims appear to anticipate wide-ranging discovery involving numerous foreign third parties. *E.g.,* Am. Compl. ¶¶ 46, 48, 60, 65. Because the main thrust of CSI's Amended Complaint is the no-Sulphur-sales-provision, the State Law Claims substantially predominate over the Lanham Act Claims. This Court therefore has the discretion to dismiss those claims even if it had supplemental jurisdiction over them.

## IV. CONCLUSION

CSI's RICO claim is precisely the type of claim that the Fourth Circuit has stated is outside of RICO's intended coverage. The Amended Complaint's allegations foreclose applying RICO to this breach-of-contract and fraud dispute, and the absence of any "per se" rules in this context should not dissuade this Court from dismissing the RICO Claim when it considers the totality of the circumstances. The conduct alleged by CSI here does not and cannot rise to the level of "long-term, habitual criminal activity" governed by RICO. Rather, the Court should

dismiss the RICO claim with prejudice because the conduct of which CSI complains is an ordinary contract dispute controlled by state law and appropriately litigated in state court.

Further, the Lanham Act Claims asserted by CSI do not create supplemental subject-matter jurisdiction such that the Court can decide those issues of state law. The Lanham Act Claims and the State Law Claims raise distinct factual questions, and each are separately determinable and maintainable without reference to the other. As a result, CSI's belated attempt to keep this entire dispute in federal court should fail and the State Law Claims of fraud, civil conspiracy, breach of contract, and unfair and deceptive trade practices should be dismissed without prejudice so that they can be litigated in the appropriate forum.

This 19th day of May, 2022.

/s/ Brian L. Church
Brian L. Church
N.C. Bar No. 39581
BChurch@robinsonbradshaw.com
Timothy P. Misner
N.C. State Bar No. 56364
tmisner@robinsonbradshaw.com

**ROBINSON, BRADSHAW & HINSON, P.A.**
101 N. Tryon St., Ste. 1900
Charlotte, North Carolina 28246
Telephone:     704.377.2536
Facsimile:     704.378.4000

*Counsel for Defendants*