# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
#### 3:21-cv-302-MOC-DSC

| | | |
|---|---|---|
| CONTROLS SOUTHEAST, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| QMAX INDUSTRIES, INC., | ) | |
| THOMAS W. PERRY, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on cross motions for summary judgment. (Doc. Nos. 79, 87). The Court heard argument on the parties' motions on March 18, 2024. This matter is now ripe for disposition.

## I. Background

The parties are competitors in the heat transfer industry. They both sell heat transfer (i.e., heat tracing) products and systems to industrial customers. Industrial customers use the parties' wares to ensure that their products—such as Sulphur, asphalt, and chemicals—maintain the correct temperature throughout the manufacturing process. Thomas Perry ("Perry") is a former employee of Controls Southeast, Inc. ("CSI" or "Plaintiff") who resigned and formed QMax Industries, Inc. ("QMax") around 2010.

In 2016, CSI sued QMax and Perry (collectively, "Defendants") for trade secret misappropriation, breach of contract, unfair competition, and patent claims. Relevant here, CSI claimed that it was the rightful owner of patents related to the design of a heat transfer product sold by both parties, known as a "Fluid Tracing System" ("FTS"). After two years of litigation, the parties reached a settlement agreement. Two terms of that settlement agreement are relevant

1

here. First, QMax and Perry assigned to CSI the patents for the design of the FTS product. Defendants agreed not to represent that they owned or used the FTS product, pledging specifically to "remove all reference to the [FTS] on its web pages and advertisements and cease all use of any materials referencing the [FTS]." (Doc. No. 14-1, § 2.2.3). Second, QMax and Perry agreed that they would not sell products for use in the Sulphur Field for an "exclusionary period" of three years. This second term was subject to an express exception for four Sulphur-related contracts that pre-dated the settlement agreement but remained un-fulfilled (the "excepted contracts").

Following the settlement, Defendants developed a new heat transfer product, FTS Generation 2 ("Gen. 2"). Like the first-generation FTS referenced in the settlement agreement, Gen. 2 is an extruded aluminum product used to transfer heat from an aluminum tube containing the heating medium (steam) to the process pipe. Unlike the first-generation FTS, however, Gen. 2 employs a "tube over channel" design. Whereas the first-generation FTS' heated tube sits directly atop the process pipe and is covered by extruded aluminum, Gen. 2's heated tube sits atop extruded aluminum and thus does not make direct contact with the process pipe.

After developing and introducing the Gen. 2 product, Defendants amended their marketing materials to remove references to the first-generation FTS. Defendants further maintain that they "actively monitored QMax's market materials for potentially infringing or illegal messages." (Doc. No. 75 at 5). Nevertheless, QMax's website continues to host a video in which Perry holds a sample of FTS Gen. 1 and describes it as QMax's "flagship product." (Doc. No. 87-6). Other post-settlement marketing materials created and disseminated by Defendants likewise continued to depict FTS Gen. 1.

Defendants' post-settlement advertising also incorporated two charts. The first chart, which pre-dates the settlement agreement, compares FTS Gen. 1 performance data against other products. Defendants continued using this chart to advertise their FTS Gen. 2 product, despite its distinct design and (presumably) performance data. The second chart, which post-dates the settlement agreement, describes the performance of the FTS Gen. 2 product "[b]ased on internal testing and research." (Doc. No. 100, Ex. 13). By comparing the first and second charts, a sophisticated consumer could obliquely assess the relative performance of FTS Gen. 1 versus FTS. Gen. 2. The first chart claims that FTS Gen. 1 performs 20% better than QMax's CST product. The second chart claims that FTS Gen. 2 performs 25% better than that same CST product. From that data, the consumer could conclude that FTS. Gen. 2 performs roughly 4% better than FTS Gen. 1.[1] There is no evidence, however, that this consumer exists.

Finally, and purporting to avail themselves of the excepted contracts provision in the 2018 settlement agreement, Defendants sold their Gen. 2 product into the Sulphur field. At the time of the settlement agreement, Defendants had not received purchase orders, estimates, or other sales documents related to the excepted contracts identified in the settlement agreement. A counterparty to one of the excepted contracts—UOG—apparently did not consider the correspondence between Defendants and UOG to constitute a contract at the time the settlement agreement was executed. Thus, Plaintiff argues, the excepted contracts were not "contracts" as

---

[1] The first chart tells us that $Gen_1 = 1.2 * CST$. The second tells us that $Gen_2 = 1.25 * CST$.

Therefore, $CST = \dfrac{Gen_1}{1.2} = \dfrac{Gen_2}{1.25}$.

Thus, $1.25 * Gen_1 = 1.2 * Gen_2$

Finally, $Gen_2 = Gen_1 * \dfrac{1.25}{1.2}$ or, put another way, $Gen_2 = 104.1\overline{6}\% \, Gen_2$.

such when the settlement agreement was executed, and thus could not be excepted from the broader exclusionary period. Defendants, however, contend that "QMax and the buyers identified [in the settlement agreement] had reached sufficiently definite agreements about the projects identified to have a meeting of the minds." (Doc. No. 75 at 4).

CSI sued Defendants in June 2021. (Doc. No. 1). Defendants moved to dismiss, (Doc. No. 11), and CSI amended their complaint. (Doc. No. 14). This Court denied Defendants' motion to dismiss CSI's amended complaint. (Doc. Nos. 19, 25). Defendants answered CSI's amended complaint, and raised counterclaims, (Doc. No. 26), which CSI unsuccessfully moved to dismiss. (Doc. Nos. 28, 34). CSI also moved for judgment on the pleadings against Defendants' counterclaims, which this Court likewise denied. (Doc. Nos. 42, 54).

Finally, in December 2023, Defendants moved for summary judgment. (Doc. No. 74). Plaintiff responded in opposition and Defendants filed a reply. (Doc. Nos. 98, 104). Plaintiff likewise moved for summary judgment, and Defendant opposed. (Doc. Nos. 87, 91, 109). The Court heard argument on the cross motions for summary judgment on March 13, 2024.

## II.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The movant for summary judgment has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it

believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted). If the movant satisfies this burden, the burden shifts to the non-movant. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 538 n.3. The non-movant may not rely upon mere allegations or denials in his pleadings to defeat a motion for summary judgment, but must instead present evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 324; <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Sylvia Dev. Corp. v. Calvert Cnty., Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

Ruling on a summary judgment motion, the Court must view the evidence and any inferences therefrom in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" <u>Ricci v. DeStefano</u>, 129 S. Ct. 2658, 2677 (2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

Faced with cross-motions for summary judgment, the Court evaluates each motion separately on its own merits using the standard set forth above. <u>See</u> <u>Rossignol v. Voorhaar</u>, 316 F.3d 516, 522 (4th Cir. 2003); <u>accord</u> <u>Local 2-1971 of Pace Int'l Union v. Cooper</u>, 364 F. Supp. 2d 546, 554 (W.D.N.C. 2005). The Court will first address Defendants' motion.

## III. Discussion

### a. Defendants' Summary Judgment Motion

Defendants move for summary judgment against all of Plaintiff's claims. The Court examines Defendants' arguments in the order raised in their briefs.

#### i. CSI's Purported Lack of Standing

First, Defendants move for summary judgment against all of Plaintiff's claims based on CSI's purported lack of standing to sue.

"Federal courts do not possess a roving commission to publicly opine on every legal question." TransUnion LLC v. Ramirez, 594 U. S. 413, 423 (2021). Article III of the Constitution limits federal courts' jurisdiction to "Cases" and "Controversies." Laufer v. Naranda Hotels, LLC, 60 F.4th 156, 161 (4th Cir. 2023) (citing U.S. Const. art. III, § 2); see Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll., 600 U.S. 181, 199 (2023). The case or controversy requirement prohibits federal courts from issuing advisory opinions, and thus requires "that a case embody a genuine, live dispute between adverse parties." Carney v. Adams, 141 S. Ct. 493, 498 (2020); see Muskrat v. United States, 219 U. S. 346, 351, 359 (1911). "To state a case or controversy under Article III, a plaintiff must establish standing." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (quoting Arizona Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 133 (2011)). To establish standing, a plaintiff must in turn satisfy three elements: injury, causation, and redressability. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992).[2]

Defendants' argument concerns the injury and causation prongs of the standing inquiry. For standing purposes, "the plaintiff must have suffered an 'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. Assessing Plaintiff's alleged injury, the

---

[2] "Those rules may sound technical, but they enforce 'fundamental limits on federal judicial power.' Allen v. Wright, 468 U. S. 737, 750 (1984). They keep courts acting like courts." Biden v. Nebraska, 600 U.S. 477, 523 (2023) (Kagan, J. dissenting). See Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 37 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.")

Court "accept[s] as valid the merits of [the plaintiff's] legal claims." See Fed. Election Comm'n v. Cruz, 142 S. Ct. 1638, 1647 (2022); see also Warth v. Seldin, 422 U.S. 490, 500 (1975). Nonetheless, each element of the standing inquiry "must be shown 'with the manner and degree of evidence required at the successive stages of the litigation.'" Brooks v. Receivables Performance Mgmt. LLC, No. 3:21-CV-579, 2023 WL 4228984, at *2 (W.D.N.C. June 27, 2023) (quoting TransUnion, 141 S. Ct. at 2208). Thus, at the summary judgment stage, "the plaintiff can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' [Fed. R. Civ. P.] 56(e), which for purposes of the summary judgment motion will be taken to be true." Lujan, 504 U.S. at 561 (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 115 (1979)).

First, Defendants argue that CSI fails to show injury in fact because "it is a corporation on paper only." (Doc. No. 75 at 9). Because CSI "has no Board of Directors, no decision-making authority, no employees, and no assets," Defendants contend, CSI cannot show that it was injured by Defendants' conduct. (Id.). Defendants adduce no authority for their claim that a subsidiary lacks standing to sue because the alleged injury also affects the subsidiary's corporate parent. At the hearing on the cross motions for summary judgment, defense counsel appeared to abandon this theory. The Court will not address it further, other than to note that Defendants' argument seems backwards: where a parent company suffers by way of injury to its subsidiary, it seems that both entities, not just the parent, have suffered injury in fact.[3]

---

[3] Indeed, in certain circumstances (ostensibly where the injury to the parent is not traceable to the injury to the subsidiary) the subsidiary alone has standing to sue. See R.R. Donnelley & Sons Co. v. Marino, 505 F. Supp. 3d 194, 204 (W.D.N.Y. 2020) ("The law is clear that a parent corporation may not assert the legal rights belonging to its subsidiary.").

Defendants' second standing argument is more limited, applying exclusively to Plaintiff's Lanham Act claims for false designation of origin and false advertising. This second standing theory implicates not only injury in fact, but also causation. The causation element of the standing inquiry requires "a causal connection between the injury and the conduct complained of." Lujan, 504 U.S. at 560.

Defendants argue that CSI cannot show injury and causation because

> CSI has not produced evidence from a single person or entity stating that it was confused or misled about QMax's product photos or marketing claims, that it relied on those photos or marketing claims in making a purchasing decision, or that any actual or prospective customer even viewed the photos and charts that CSI mined from QMax's website.

(Doc. No. 75 at 11). Defendants' argument fails. At the summary judgment stage Plaintiff must plead an "actual or imminent" injury, supported by "specific facts," which the Court must accept as true. Lujan, 504 U.S. at 560–61 (emphasis supplied). If, taking the facts and inferences in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Plaintiff's injury is "actual or imminent," Plaintiff's claim survives a summary judgment for lack of standing. Here, Plaintiffs allege that they have or likely will suffer financial injury chargeable to Defendants' purported Lanham Act violations. Of course, "financial harm is a classic and paradigmatic form of injury in fact." Air Evac EMS, Inc. v. Cheatham, 910 F.3d 751, 760 (4th Cir. 2018) (quoting Cottrell v. Alcon Labs., 874 F.3d 154, 164 (3d Cir. 2017)). What's more, the Lanham Act does not require evidence of actual financial injury, but instead only a likelihood of injury. See 15 U.S.C. § 1125(a)(1); De Simone v. VSL Pharm., Inc., 395 F. Supp. 3d 617, 628 (D. Md. 2019), aff'd in relevant part, 847 F. App'x 174 (4th Cir. 2021) ("[T]he statute permits false advertising actions based on the threat of injury alone … proof of injury or likelihood of injury does not require proof of actual damages.").

8

Plaintiff CSI has adduced evidence which, if taken as true, would show that Defendants violated the Lanham Act and that such violations likely harmed Plaintiff. That is all Plaintiff must do to avoid summary judgment for lack of standing. Defendants may disagree that the parties are direct competitors in a two-supplier market, that Defendants' advertisements were literally false, and that but for Defendants' purportedly false advertisements Plaintiff would have made more sales. See (Doc. No. 100 at 15–16). But this is ultimately a disagreement on the merits, not standing.[4] Viewing Plaintiff's contentions in the most favorable light, a reasonable jury could find that Plaintiff did or likely will suffer injury because of Defendants' alleged Lanham Act violations.

### ii. CSI's Lanham Act Claim

To the extent that Defendants' lack-of-injury theory bleeds into the merits of Plaintiff's Lanham Act claim, Defendants' argument fails for the reasons articulated above. Viewing the facts in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Plaintiff has been or is likely to be injured by diversion of sales or diminished goodwill.

Defendants additionally contend that Plaintiff's Lanham Act claims are susceptible to summary judgment because Plaintiff has failed to show consumer confusion, which according to

---

[4] The parties essentially disagree over whether this case is more like Verisign or De Simone. Verisign, Inc. v. XYZ.COM LLC, 848 F.3d 292, 299–300 (4th Cir. 2017); De Simone v. VSL Pharm., Inc., 395 F. Supp. 3d 617, 628 (D. Md. 2019), aff'd in relevant part, 847 F. App'x 174 (4th Cir. 2021). In Verisign, the Fourth Circuit held that where a plaintiff's analysis "assumes rather than demonstrates" that the defendant's sales were attributable to alleged Lanham Act violations, the plaintiff fails to establish injury sufficient to support Article III standing. 848 F.3d at 299–301; see also PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 122 (4th Cir. 2011). In De Simone, however, the Fourth Circuit distinguished Verisign's application to cases involving "passing off." 395 F. Supp. 3d at 631. Whether Plaintiff's theory sufficiently demonstrates injury and causation, and whether this case involves a "passing off" scenario wherein "the path from the false advertising to the plaintiff's injury is shorter and more direct," id., are issues of fact for the jury. So, too, is Plaintiff's contention that it is Defendants' direct competitor in a two-supplier market, and that Defendants' advertisements were literally false.

9

Defendant "is an essential element of all Lanham Act claims." (Doc. No. 75 at 14) (quoting Verisign, Inc., 848 F.3d at 299). Defendants misstate the law: "Where the advertisement is literally false, a violation may be established without evidence of consumer deception." Scotts Co. v. United Indus. Corp., 315 F.3d 264, 273 (4th Cir. 2002). Taking the facts in the light most favorable to Plaintiff, a reasonable jury could conclude that some of Defendants' advertisements were literally false, and thus that Plaintiff need not show consumer deception.

Defendants further move for summary judgment against Plaintiff's Lanham Act claims as to Mr. Perry, contending that "a Lanham Act plaintiff must show that the defendant made the relevant statements or assertions in commerce" but that "CSI has adduced no evidence that Perry, as an individual, made any relevant representations or assertions." (Doc. No. 75 at 15). Defendants again misstate the law. Mr. Perry is a corporate officer of Defendant QMax. A reasonable jury could find that Mr. Perry thus had the ability to control the corporate conduct about which Plaintiff complains. If the jury so finds, Mr. Perry could be held independently liable for that conduct. Dao Travels, LLC v. Charleston Black Cab Co., No. 2:14-CV-01967-PMD, 2015 WL 631137, at *6 (D.S.C. Feb. 13, 2015); Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 149 (4th Cir. 1987); Universal Furniture, Int'l, Inc. v. Frankel, 835 F. Supp. 2d 35, 48 (M.D.N.C. 2011) aff'd, 538 F. App'x 267 (4th Cir. 2013). Thus, the Court will deny Defendants' summary judgment motion as to Plaintiff's Lanham Act claims against Mr. Perry.

### iii. CSI's RICO Claim

Next, Defendants move for summary judgment against Plaintiff's Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., claim. To pursue a civil remedy under RICO, the plaintiff must show that they suffered an injury chargeable to a RICO violation. 18 U.S.C. § 1964. The RICO plaintiff must also produce evidence of a "pattern" of

racketeering activity. 18 U.S.C. § 1962. Such a "pattern" must "rise above the routine" to incorporate activity that is "extended, widespread, or particularly dangerous." Flip Mortgage Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1988). A "single scheme perpetrated . . . against a single victim" rarely suffices to state a RICO claim. See id.; but see Al-Abood v. El-Shamari, 217 F.3d 225, 238 (4th Cir. 2000); Brandenburg v. Seidel, 859 F.2d 1179, 1185 (4th Cir. 1988). RICO's "pattern" requirement reflects the Congressional intent underlying the statute, i.e., to combat the predation of organized crime and other "unlawful activities whose scope and persistence pose a special threat to social well-being." See Int'l Data Bank, Ltd. v. Zepkin, 812 F.2d 149, 155 (4th Cir. 1987); H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 245 (1989).

The Fourth Circuit applies a "flexible" approach to RICO's "pattern" requirement, Brandenburg, 859 F.2d at 1185, a case-by-case analysis assessing "the 'criminal dimension and degree' of the alleged misconduct." HMK Corp. v. Walsey, 828 F.2d 1071, 1073 (4th Cir. 1987) (quoting Int'l Data Bank, Ltd., 812 F.2d at 155); see Capital Lighting & Supply, LLC v. Wirtz, No. CV JKB-17-3765, 2018 WL 3970469, at *6 (D. Md. Aug. 20, 2018). "Factors relevant to this inquiry include the number and variety of predicate acts and the length of time over which they were committed, the number of putative victims, the presence of separate schemes, and the potential for multiple distinct injuries." Brandenburg, 859 F.2d at 1185. "[N]o mechanical test can determine the existence of a RICO pattern." Int'l Data Bank, Ltd., 812 F.2d at 155.

Plaintiff contends that Mr. Perry's purportedly false representations of compliance with the settlement agreement, allegedly improper sales into the Sulfur field, and "wide-spread pattern of falsely advertising their products via e-mail and across various Internet media over a multi-year period" are actionable under RICO. (Doc. No. 100 at 21). The Court disagrees. Even if, as Plaintiff alleges, Mr. Perry engaged in multiple schemes, the settlement agreement is less than

11

ten years old, and CSI is the only putative victim. There is certainly no evidence that Mr. Perry's activity was "widespread," never mind "particularly dangerous." Flip Mortgage Corp., 841 F.2d at 538. Finally, permitting Plaintiff's RICO theory to proceed to trial would be inconsistent with Congress' intent that RICO be used to combat "unlawful activities whose scope and persistence pose a special threat to social well-being." Int'l Data Bank, Ltd., 812 F.2d at 155. Thus, the Court finds that, even taking the evidence in the light most favorable to the Plaintiff, Mr. Perry has not engaged in a "pattern" of behavior actionable under RICO, and so will grant Defendants' summary judgment motion as to Plaintiff's RICO claim.

### iv. CSI's Fraud Claim

Defendants' summary judgment motion identifies two putative flaws in Plaintiff's fraud claim: first, that Plaintiff cannot prove it was injured by Defendants' alleged fraud; and second, that Plaintiff did not rely on Defendants' purportedly fraudulent statements. (Doc. No. 75). Injury and reliance are essential elements of fraud under North Carolina law. See Food Lion, Inc. v. Capital Cities/ABC, Inc., 194 F.3d 505, 513 (4th Cir. 1999); Trana Discovery, Inc. v. S. Research Inst., 915 F.3d 249, 255 (4th Cir. 2019); Jay Group, Ltd. v. Glasgow, 139 N.C. App. 595, 599 (2000). If, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that Plaintiff relied on and was subsequently injured by Defendants' allegedly fraudulent representations, then the Court must dismiss Plaintiff's fraud claim.

Plaintiff's fraud claim relates to Defendants' statements regarding the "excepted contracts" identified in the 2018 settlement agreement. Plaintiff contends that Defendants falsely represented that Defendants had a "backlog" of four contracts to sell into the Sulfur field at the time the settlement agreement was reached. Relying on Defendants' "backlog" assertion, Plaintiff agreed to exempt these four contracts from the Sulfur field restriction, essentially

12

agreeing to "forego sales for the projects in the [e]xcepted [c]ontracts, believing Defendants to have already made those sales." (Doc. No. 100 at 22).

Because there remains at least a genuine dispute of material fact as to whether Plaintiff relied on and was injured by Defendants' representations regarding the Sulfur field contracts— and as to whether Defendants' "backlog" assertion was in fact false—the Court will deny summary judgment against Plaintiff's fraud claim.

First, as to the falsity of Defendants' "backlog" representation, a factfinder could conclude that Defendants had not received purchase orders, estimates, or other sales documents related to the excepted contracts, and thus that Defendants and their customers had not "reached sufficiently definite agreements about the projects identified to have a meeting of the minds." (Doc. No. 75 at 4). Consequently, a jury could reasonably conclude that Defendants' representations regarding the existence of a backlog of "contracts" were false, since no contracts existed. Second, as to Plaintiff's reliance, a reasonable factfinder could conclude that CSI relied on Defendants' "backlog" representation in agreeing to exempt the excepted contracts from the Sulfur field restriction and thus "essentially agreed to forego sales for the projects in the [e]xcepted [c]ontracts, believing Defendants to have already made those sales." (Doc. No. 100 at 22). Third, as to injury, a jury could reasonably find that Plaintiff and Defendants operate in a two-supplier market, such that sales made by Defendants constitute sales lost by Plaintiff.[5]

Because a reasonable factfinder, taking the facts and inferences therefrom in the light most favorable to Plaintiff, could find that Plaintiff was injured by relying on Defendants' false "backlog" assertion, the Court will deny summary judgment as to Plaintiff's fraud claim.

### v. CSI's Civil Conspiracy Claim

---

[5] Indeed, two of the three counterparties to the excepted contracts were CSI customers, and CSI had bid on the relevant projects. (Doc. No. 100 at 22).

Next, Defendants move for summary judgment against Plaintiff's civil conspiracy claim. To recover for civil conspiracy or facilitation of fraud, Plaintiff must show that (1) Defendants made an agreement to defraud Plaintiff, (2) Defendants committed an overt tortious act in furtherance of that agreement, and (3) Plaintiff suffered damages as a result. Neugent v. Beroth Oil Co., 149 N.C. App. 38, 53 (2002).

Defendants first contend that CSI's civil conspiracy claim must fail because CSI's fraud claim does not survive summary judgment. See Jay Group, Ltd., 139 N.C. App. at 599. Because CSI's fraud claim does survive summary judgment, Defendants' first argument against CSI's civil conspiracy claim is unavailing.

Next, Defendants claim that Plaintiff has adduced "no evidence whatsoever" to support its allegation that Defendants "conspired with third-party distributors or representatives to breach the [s]ettlement [a]greement." (Doc. No. 75 at 21). But a reasonable factfinder, viewing the evidence in the light most favorable to Plaintiff, could find that emails referring to the excepted contracts as a "free pass" and allegedly attempting to circumvent the settlement agreement constitute evidence of an agreement to commit fraud.

Finally, Defendants renew their familiar refrain that summary judgment is warranted because even if Defendants broke the law, Plaintiff was not injured. Defendants' argument fails against Plaintiff's conspiracy claim for the same reason it fell flat against Plaintiff's fraud claim. Viewing the evidence in the light most favorable to Plaintiff, a reasonable factfinder could conclude that the parties operate in a two-supplier market and that any sales gained by Defendants were necessarily sales lost by Plaintiff.

Because a jury could reasonably find that Defendants agreed with counterparties to the exempted contracts to defraud Plaintiff, committed an overt tortious act in furtherance of that

agreement, and that Plaintiff suffered damages as a result, the Court will deny Defendants'

summary judgment motion as to Plaintiff's conspiracy claim. See Worley Claims Servs., LLC v.

Jefferies, 429 F. Supp. 3d 146, 166–67 (W.D.N.C. 2019); Waldon v. Burris, No. 3:04-CV-50,

2007 U.S. Dist. LEXIS 57940 (W.D.N.C. Aug. 7, 2007).

### vi. CSI's Contract Claim and Proposed Disgorgement Remedy

Next, Defendants move for summary judgment against Plaintiff's breach of contract

claim—related to Defendants' alleged violation of the settlement agreement's exclusionary

period—arguing that Plaintiff suffered no actual damages attributable to Defendants' purported

breach. Plaintiff responds that disgorgement of profits attributable to Defendants' breach is an

appropriate measure of damages. (Doc. No. 100 at 24). Defendants retort that disgorgement is

not a proper remedy for a contract claim under North Carolina law. (Doc. No. 75 at 23).

Defendants are correct that "[a] party claiming breach of contract is generally limited to

recovering loss actually suffered, and damages are intended to put the party in the same position

it would have been if the contract had not been breached." EarthKind, LLC v. Lebermuth Co.

Inc., No. 519CV00051KDBDCK, 2021 WL 2226492, at *2 (W.D.N.C. June 2, 2021) (citing

Hassett v. Dixie Furniture Co., 333 N.C. 307, 312–13 (1993)). But disgorgement is an

appropriate alternative method by which Plaintiff may attempt to prove actual damages

attributable to Defendants' breach. (Id.). Because there remain genuine disputes of material fact

regarding Defendants' alleged breach of the settlement agreement (especially whether the

excepted contracts existed at the time the agreement was executed) and Plaintiff's damages

15

formulation (especially whether the parties operate in a two-supplier market), the Court will deny Defendants' summary judgment motion as to Plaintiff's breach claim.[6]

### vii. CSI's UDTPA Claim

Finally, Defendants move for summary judgment against Plaintiff's North Carolina Unfair and Deceptive Trade Practices Act ('UDTPA") claim. Defendants argue that Plaintiff's UDTPA claim is an improper attempt "to manufacture a tort dispute out of a contract dispute." Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998); Strum v. Exxon Co., 15 F.3d 327, 329 (4th Cir. 1994). Defendants' premise is correct: absent aggravating circumstances, a breach of contract is insufficient to support a UDTPA claim. See Heron Bay Acquisition, LLC v. United Metal Finishing, Inc., 245 N.C. App. 378, 382–83 (2016). Here, though, Plaintiff's UDTPA claim is not predicated on Defendants' purported breach of contract, but instead on Defendants' alleged violation of the Lanham Act. And it is "well settled in North Carolina that unfair competition under the Lanham Act . . . may constitute unfair or deceptive practices under the UDTPA." CPI Sec. Sys. v. Vivint Smart Home, No. 3:20-cv-504, 2021 U.S. Dist. LEXIS 216182, at *12 (W.D.N.C. Nov. 9, 2021); see Universal Furniture Int'l, Inc. v. Collezione Eur. USA, Inc., No. 1:04CV00977, 2007 WL 2712926, at *15 (M.D.N.C. Sept. 14, 2007), aff'd sub nom. Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc., 618 F.3d 417 (4th Cir. 2010), as amended (Aug. 24, 2010). Because Plaintiff's Lanham Act claim withstands summary judgment, Plaintiff's UDTPA claim likewise survives. See Shell Trademark Mgmt. BV v. Ray Thomas Petroleum Co., 642 F. Supp. 2d 493, 505 (W.D.N.C. 2009).

---

[6] In truth, the Court need not reach Defendants' disgorgement argument with respect to Plaintiff's breach claim. See EarthKind, LLC, No. 519CV00051KDBDCK, 2021 WL 2226492, at *2 ("Evidence of how Defendants formulate their loss can be argued at a later time.").

The Court will thus deny Defendants' summary judgment motion as to Plaintiff's UDTPA claim.

### b. Plaintiff's Summary Judgment Motion

Plaintiff moves for offensive summary judgment on part of their Lanham Act claim, and for defensive summary judgment against Defendants' counterclaims under UDTPA and for abuse of process. The Court examines Plaintiff's arguments in the order raised in its briefs.

### CSI's Lanham Act Claim

Plaintiff seeks offensive summary judgment on their false advertising claim, specifically that Defendants' use of pictures of FTS Gen. 1, as well as Gen. 1 performance data, in advertisements for FTS Gen. 2 violated the Lanham Act. To succeed on their false advertising claim, Plaintiff must establish the following:

> (1) [Defendants] made a false or misleading description of fact or representation of fact in a commercial advertisement about [their] own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) [Defendants] placed the false or misleading statement in interstate commerce; and (5) [CSI] has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

See Scotts Co. v. United Indus. Corp., 315 F.3d 264, 272 (4th Cir. 2002); PBM Prods., LLC v. Mead Johnson & Co., 639 F.3d 111, 120 (4th Cir. 2011). To prevail on summary judgment, Plaintiff must show that no reasonable factfinder, viewing the evidence in the light most favorable to Defendants, could conclude that Plaintiff fails to establish all five elements. Plaintiff cannot carry this heavy burden.

The Court need not analyze each element of Plaintiff's Lanham Act claim, because Plaintiff's failure to establish even a single element at the demanding summary judgment standard requires the Court to deny Plaintiff's motion. Addressing Defendants' summary

17

judgment motion against Plaintiff's Lanham Act claim, this Court concluded that a reasonable factfinder, taking the evidence in the light most favorable to Plaintiff, could conclude that Plaintiff was injured by Defendants' allegedly false advertising. But taking that same evidence in the light most favorable to Defendants—as the Court must when addressing Plaintiff's summary judgment motion—a reasonable jury could likewise find that Plaintiff fails to show that they were injured by Defendants' conduct. Specifically, a factfinder could reasonably conclude that the parties are <u>not</u> direct competitors in a two-supplier market, or that Plaintiff would <u>not</u> have made more sales but for Defendants' allegedly false advertisements. This genuine dispute of material fact as to injury and causation prohibits the Court from granting Plaintiff's summary judgment motion on the Lanham Act claim. The Court does not, and need not, reach Plaintiff's summary judgment argument with respect to the remaining elements of the Lanham Act claim.

### i. Defendants' UDTPA Counterclaim

Next, Plaintiff moves for summary judgment against Defendants' UDTPA counterclaim. Defendants argue that by bringing this suit against them, Plaintiff committed an unfair or deceptive act, in commerce, which proximately caused Defendants' injury. To prevail on their counterclaim, Defendants must show that Plaintiff's suit "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." <u>See</u> <u>U.S. v. Ward</u>, 618 F. Supp. 884, 907 (E.D.N.C. 1985); <u>Octane Fitness, LLC v. ICON Health & Fitness, Inc.</u>, 572 U.S. 545, 556 (2014). A lawsuit is a sham if it is objectively baseless such that no reasonable litigant could realistically expect success on the merits. <u>Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.</u>, 508 U.S. 49, 60 (1993).

Thus, to survive Plaintiff's summary judgment motion against Defendants' UDTPA counterclaim, Defendants need only show that a reasonable jury taking the evidence in the light

18

most favorable to Defendants could conclude that Plaintiff's lawsuit is objectively baseless, "in commerce," and proximately caused Defendants to suffer injury. In the Fourth Circuit, a factfinder could so find based on "signs of bad-faith petitioning" by Plaintiff. Waugh Chapel S., LLC v. United Food & Commercial Workers Union Local 27, 728 F.3d 354, 367 (4th Cir. 2013). Taking the evidence in the light most favorable to Defendants, a reasonable factfinder could conclude that Plaintiff's lawsuit was baseless in light of potential indicia of bad-faith, or "'a policy of starting legal proceeding without regard to the merits.'" See Waugh Chapel S., LLC, 728 F.3d at 367 (quoting USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO, 31 F.3d 800, 811 (9th Cir. 1994)). Defendants carry their burden principally by referring to correspondence from Plaintiff's Business Development Manager.[7]

Because a reasonable jury could conclude that Plaintiff brought this suit "to interfere directly with the business relationships of a competitor," a reasonable jury could likewise conclude that Plaintiff acted "in commerce" as UDTPA requires. See Ward, 618 F. Supp. at 907. That this lawsuit injured Defendants, at the very least by causing them to incur legal fees, is beyond dispute. Thus, the Court will deny Plaintiff's summary judgment motion as to Defendants' UDTPA counterclaim.

### ii. Defendants' Abuse of Process Counterclaim

Finally, Plaintiff moves for summary judgment against Defendants' abuse of process counterclaim. To prevail on their counterclaim, Defendants must show that Plaintiff (1) initiated process with an ulterior motive, and (2) maliciously misused or mis-applied process to accomplish a purpose not warranted or commanded by the process. Pinewood Homes, Inc. v. Harris, 184 N.C. App. 597, 602, (2007); Fowle v. Fowle, 263 N.C. 724, 727 (1965). A party

---

[7] See, e.g., Cipriano Dep. Ex. 34 at 1; Cipriano Dep. Ex. 46 at 2; Cipriano Dep. Ex. 50–51.

initiates process with an ulterior motive when they act to eliminate a competitor. I-Minerals USA, Inc. v. Zielke, No. 15-CV-94, 2015 WL 5457840, at *6 (W.D.N.C. Sept. 16, 2015); Spirax Sarco, Inc. v. SSI Eng'g, Inc., 122 F. Supp. 3d 408, 430 (E.D.N.C. 2015). A party maliciously misuses process when they attempt to use the proceeding to gain an advantage against their counterparty in a collateral matter. Chidnese v. Chidnese, 210 N.C. App. 299, 311 (2011); Fox v. City of Greensboro, 279 N.C. App. 301, 327 (2021).

To prevail on summary judgment against Defendants' abuse of process counterclaim, Plaintiff must show that no reasonable factfinder considering the evidence in the light most favorable to Defendants could conclude that Plaintiff (1) acted with an ulterior motive to (2) accomplish an objective not compelled by this lawsuit. Plaintiff cannot carry this burden. Defendants have adduced evidence tending to show that Plaintiff volitionally "leveraged" this litigation to convert customers from QMax to CSI. Taking this evidence in the light most favorable to Defendants, a reasonable jury could conclude that Plaintiff instituted this litigation with the ulterior motive of weakening or eliminating a competitor, specifically by gaining an advantage against that competitor in the collateral matter of customer sales. The Court will thus deny Plaintiff's summary judgment motion as to Defendants' abuse of process counterclaim.

## IV. Conclusion

For the foregoing reasons, the Court will grant in part Defendants' summary judgment motion as to Plaintiff's RICO claim but deny Defendants' motion in all other respects. The Court will deny Plaintiff's summary judgment motion in its entirety.

### ORDER

**IT IS, THEREFORE, ORDERED,** that Defendants' summary judgment motion is **GRANTED IN PART and DENIED IN PART**. Specifically, Defendants' summary judgment

motion is **GRANTED** with respect to Plaintiff's RICO claim, which is hereby **DISMISSED**. As to Plaintiff's remaining claims, Defendants' summary judgment motion is hereby **DENIED**.

      **IT IS FURTHER ORDERED** that Plaintiff's summary judgment motion is **DENIED**.

Max O. Cogburn Jr.
United States District Judge